JOSEPH H. HUNT
Assistant Attorney General
ANDY J. MAO
DAVID M. FINKELSTEIN
ARTHUR S. DI DIO
ROHITH V. SRINIVAS
CLAIRE L. NORSETTER
Attorneys, Civil Division
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
        Telephone:  (202) 616-2971
        Facsimile:  (202) 307-3852
        E-mail: David.M.Finkelstein@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CV 14-6979 DDP (PJWx) |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| RELIANCE MEDICAL SYSTEMS, LLC, APEX MEDICAL TECHNOLOGIES, LLC, KRONOS SPINAL TECHNOLOGIES, LLC, BRET BERRY, JOHN HOFFMAN, AND ADAM PIKE, | |
| Defendants. | |

# **TABLE OF CONTENTS**

NATURE OF ACTION ...................................................................................... 1

JURISDICTION ................................................................................................. 2

VENUE .............................................................................................................. 2

PARTIES ............................................................................................................ 2

BACKGROUND ................................................................................................ 4

    I.      THE MEDICARE PROGRAM ............................................................ 4

          A.  Medicare Part A ..................................................................... 5

          B.  Medicare Part B ..................................................................... 6

    II.     SPINAL SURGERY ............................................................................ 8

    III.   THE ANTI KICKBACK STATUTE ................................................... 10

          A.  AKS Safe Harbors ............................................................... 11

          B.  OIG Advisory Opinions ....................................................... 12

          C.  OIG Special Fraud Alerts and Related Guidance ................. 12

FACTS .............................................................................................................. 13

    I.      DEFENDANTS' KICKBACK SCHEME ........................................... 13

          A.  Reliance Medical Systems ................................................... 13

          B.  Apex Medical Technologies ................................................. 14

          C.  Kronos Spinal Technologies ................................................ 18

          D.  Reliance's Sham Employment of Referring Physicians in 2013 ......... 22

    II.     ADDITIONAL EVIDENCE OF DEFENDANTS' UNLAWFUL

          PURPOSE ........................................................................................... 27

          A.  Minimal or Non-Existent Capital Contributions ................. 28

          B.  Concealment of Financial Relationships .............................. 29

          C.  Coercion of Hospital Payors ................................................ 31

          D.  Forced Buyouts of Low-Referring Physicians ..................... 32

          E.  Physician Selection .............................................................. 33

          F.  Other Instances when Defendants Ignored Legal Advice ..... 35

i

III.   DEFENDANTS' KNOWLEDGE OF PHYSICIAN-INVESTOR OVERUTILIZATION ................................................................ 35

IV.   OTHER EVIDENCE OF DEFENDANTS' PROFITS AND PRACTICES .................................................................................. 36

V.   MEDICARE CLAIMS ................................................................... 37

    A.  "Patient A" ............................................................................. 38

    B.  "Patient B" ............................................................................. 39

    C.  "Patient C" ............................................................................. 39

    D.  "Patient D" ............................................................................. 40

    E.  "Patient E" ............................................................................. 41

COUNT I ............................................................................................. 42

COUNT II ............................................................................................ 43

COUNT III .......................................................................................... 44

COUNT IV .......................................................................................... 45

COUNT V ............................................................................................ 46

PRAYER FOR RELIEF ...................................................................... 46

JURY TRIAL ....................................................................................... 47

Defendant Reliance Medical Systems, LLC and its individual owners (collectively, "Reliance") and their captive subsidiaries distribute medical devices that can be used in spinal fusion surgeries.  Reliance's business model is to pay physicians to use its spine devices in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).  Through two of its subsidiaries alone – Apex Medical Technologies, LLC ("Apex") and Kronos Spinal Technologies, LLC ("Kronos") – Reliance funneled more than $5.5 million in kickbacks to five referring physicians between 2007 and 2012.

"[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."  42 U.S.C. § 1320a–7b(g).  This is an action to recover damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and to recover money for common law or equitable causes of action for payment by mistake and unjust enrichment.

## NATURE OF ACTION

1.     The United States' claims arise out of an illegal scheme and conspiracy by Defendants knowingly to cause claims to be submitted to the Medicare program for items and services that were tainted by kickbacks, were not reasonable and necessary, and were otherwise false and fraudulent.

2.     At all relevant times, Reliance sold spinal implants in Southern California through distributorships that it controlled, including Apex and Kronos.  Bret Berry and Adam Pike own and operate Reliance, Apex, and Kronos.  John Hoffman was Berry and Pike's partner, and co-owner of Apex and Kronos.

3.     The spinal fusion surgeries of the physicians that invested in and/or were employed by Apex and Kronos were tainted by kickbacks.  Consequently, the Medicare claims for the spinal fusion surgeries these physicians performed using Reliance implants were false and not payable.  This action seeks to recover the money Medicare paid as a result of the false claims that the Defendants caused to be submitted by Apex and Kronos physician-investors and physician-employees.

4.     In addition, certain of the spinal fusion surgeries performed by Apex and

Kronos investors and/or employees were not medically necessary or were more extensive than what was necessary.  The payments that Defendants made to physicians caused them to perform surgeries using Reliance implants that were not medically necessary and/or were more extensive than what was necessary.  This action also seeks to recover the money Medicare paid as a result of the false claims for medically unnecessary surgeries and related hospital services that Defendants caused to be submitted.

## JURISDICTION

5.     This action arises under the FCA, 31 U.S.C. §§ 3729-33, and under the common law.

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1345 because the United States is the Plaintiff.  In addition, the Court has subject matter jurisdiction over the FCA claims under 28 U.S.C. § 1331.  The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact or transacted business in the Central District of California.

## VENUE

7.     Venue is proper in the Central District of California under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendants conducted business in this district; Reliance physician-investors and physician-employees performed surgeries using Reliance implants in this district; and many of the events giving rise to these claims occurred in this district.

## PARTIES

8.     The United States of America is the Plaintiff.  The United States brings this action on behalf of the United States Department of Health and Human Services (HHS), including HHS's component, the Centers for Medicare and Medicaid Services (CMS), which administers the Medicare and Medicaid Programs.

9.     Reliance is a Utah limited liability company.  Reliance's mailing address is 1838 East 9800 South, Sandy, Utah, 84092, and its principal place of business is 545

West 500 South, Bountiful, Utah, 84010.  At all relevant times, Reliance operated distributorships that paid kickbacks to physicians; these physicians, in turn, caused hospitals in which these physicians worked to purchase Reliance spinal implants.

10.     Apex is one such Reliance distributorship.  Apex is a Florida company, which lists its street address as 11313 Mandarin Ridge Lane, Jacksonville, Florida, 32258.  Between 2010 and 2012, Apex conducted business in Southern California.  At all relevant times, Apex derived revenues from the sale of spinal implants to the hospitals in which its physician-investors performed surgeries.

11.     Kronos is another Reliance distributorship.  Kronos is a Florida company, which lists its street address as 11313 Mandarin Ridge Lane, Jacksonville, Florida, 32258.  At all relevant times, Kronos's principal place of business was in Southern California.  At all relevant times, Kronos derived revenues from the sale of spinal implants to the hospitals in which its physician-investors and physician-employees performed surgeries.

12.     Bret Berry is a resident of the state of Florida.  Berry is a Reliance founder and owner and an investor in approximately fifteen companies that distribute Reliance implants, including Apex and Kronos.  His last known address is 514 Frank Shaw Road, Tallahassee, Florida, 32312.

13.     John Hoffman is a resident of the state of Nevada.  Hoffman is a distributor for Reliance and an investor in approximately five companies that distribute Reliance implants, including Apex and Kronos.  His last known address is 2268 Edge Ridge Court, Henderson, Nevada, 89052.

14.     Adam Pike is a resident of the state of Florida.  Pike is a Reliance founder and owner and an investor in approximately fifteen companies that distribute Reliance implants, including Apex and Kronos.  His last known address is 7314 Ramoth Drive, Jacksonville, Florida, 32226.

3

## BACKGROUND

### I.    THE MEDICARE PROGRAM

15.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, known as the Medicare Program, to pay for the costs of certain health care services. 42 U.S.C. § 1395, *et seq.*  Entitlement to Medicare benefits is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426 to 426-1.

16.    HHS is responsible for the administration and supervision of the Medicare Program.  CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.  For purposes of this action, there are two primary components to the Medicare Program:  Part A and Part B.  Medicare Part A authorizes payment for institutional care, including inpatient hospital services, skilled nursing facilities, and home health care.  *See* 42 U.S.C. §§ 1395c to 1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of "medical and other services."  *See* 42 U.S.C. §§ 1395j to 1395w-5.

17.    To participate in the Medicare Program, a health care provider must file a provider agreement with the Secretary of HHS.  42 U.S.C. § 1395cc.

18.    The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the Medicare Program and in order to receive reimbursement from Medicare.  The provider agreement requires a physician to certify that "I understand that *payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with . . . [inter alia] the Federal Anti-Kickback Statute*, 42 U.S.C. section 1320a-7b(b) . . . ."  Form CMS-855I, available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/EnrollmentApplications.html (visited Aug. 30, 2019) (emphasis added).

19.    Medicare reimburses only those services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ."  42

U.S.C. § 1395y(a)(1)(A).  In submitting claims for payment to Medicare, providers must certify that the information on the claim form presents an accurate description of the services rendered and that the services were reasonably and medically necessary for the patient.

### A.  Medicare Part A

20.     Part A of the Medicare program authorizes payment for institutional care, including hospitalization, for eligible patients.

21.     Under Medicare Part A, a hospital enters into an agreement with Medicare to provide health care items and services to treat Medicare patients.  The hospital, also called a "provider," is authorized to bill Medicare for that treatment.

22.     During the relevant time period, CMS reimbursed hospitals for inpatient Part A services through Medicare Administrative Contractors (MACs).

23.     MACs are private insurance companies that are responsible for determining the amount of payments to be made to providers.  *See* 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006).  Under their contracts with CMS, MACs review, approve, and pay Medicare bills, called "claims," received from hospitals.  *See* 42 C.F.R. § 421.5(b).  Those claims are paid with federal funds.

24.     Since 2007, in order to get paid, a hospital must complete and submit a claim for payment on a Form UB-04.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare program relies upon the accuracy and truthfulness of the UB-04 Forms to determine whether the service is payable and what, if any, amounts to pay the hospital.

25.     In addition, and at the end of each fiscal year, a hospital submits to the MAC a form referred to as a "cost report," which identifies any outstanding costs that the hospital is claiming for reimbursement for that year.  The cost report serves as the final claim for payment that is submitted to Medicare.  The Medicare program relies upon the accuracy and truthfulness of the cost report to determine what amounts, if any,

the hospital is owed, or has been overpaid during the year.

26.     The cost report form requires the provider to certify its understanding that "if services identified in this report were provided through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil, and administrative action, fines and/or imprisonment may result."  Form CMS-1984-14, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-1984-14.html (visited Aug. 30, 2019).

27.     In 1983, Congress established the prospective payment system (PPS) as the system by which hospitals are reimbursed for inpatient hospital costs.  Under PPS, the amount Medicare pays a hospital for treating an inpatient Medicare beneficiary is based in large part on the particular condition that led to the patient's admission to, or that was principally treated by, the hospital.

28.     Under PPS, a patient's illness or condition is categorized under a classification system called a diagnostic related group (DRG).  The DRG establishes how much the hospital will be paid under Medicare and reflects the resources the patient's condition or treatment typically requires.  The MAC uses the patient-specific information (for example, the diagnosis codes) submitted by the hospital on the UB-04 to determine what DRG is assigned to a certain claim, and hence, what amount will be paid.

29.     The DRG is intended to reimburse the hospital for the expected costs of any items that it must purchase in connection with the hospitalization.  In the case of spinal surgeries, the DRG is intended to compensate the hospital for any spinal implants, among other things, where those devices are reasonable and necessary to treat a Medicare beneficiary.

**B.  Medicare Part B**

30.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury.  Eligible

individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums. Payments under Medicare Part B are typically made directly under assignment to service providers and practitioners, such as physicians, rather than to the patient/beneficiary. In that case, the physician bills the Medicare Program directly.

31. The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS. To assist in the administration of the Medicare Part B Program, CMS contracts with MACs. 42 U.S.C. § 1395u. MACs are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

32. In order to bill Medicare, a physician must submit a claim form called a CMS 1500 form to the carrier. When the CMS 1500 is submitted, the physician certifies that the services for which payment is sought were "medically indicated and necessary for the health of this patient." The CMS 1500 also requires the physician to certify that "this claim . . . complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment *including but not limited to the Federal anti-kickback statute . . . .*" Form CMS-1500, available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-Items/CMS1188854.html (visited Aug. 30, 2019) (emphasis added).

33. Physicians wishing to submit the CMS 1500 electronically must submit a provider enrollment form.

34. For a CMS 1500 claim to be paid by the Medicare Part B Program, the claim must identify each service the physician rendered to the patient. The service is identified through a corresponding code that is listed in the American Medical Association (AMA) publication called the Current Procedural Terminology (CPT) Manual. The CPT is a systematic list of codes for procedures and services performed by or at the direction of a physician. Each procedure or service is identified by a five-digit CPT code.

35. In addition to the CPT Manual, the AMA publishes the International

Classification of Diseases (ICD-10) Manual, which assigns a unique numeric identifier to each medical condition.  In order to be payable by Medicare, the CMS 1500 claim form must identify both the CPT code that the provider is billing for and the corresponding ICD-9 code that identifies the patient's medical condition and that renders the provider's service(s) medically necessary.

## II.   SPINAL SURGERY

36.   There are four regions of the spine:  the cervical, thoracic, lumbar, and sacral regions.  The cervical spine consists of seven vertebrae in the neck region; the thoracic spine consists of twelve vertebrae in the chest region; the lumbar spine consists of five vertebrae in the lower back region; and the sacral region is below the lumbar region and consists of additional fused (or non-articulating) vertebrae.

37.   Each vertebra of the spine is referred to by a letter and number denoting its region and location.  From top to bottom, the seven vertebrae of the cervical spine are named C1-C7; the twelve vertebrae of the thoracic spine are named T1-T12; the five vertebrae of the lumbar spine are named L1-L5; and the vertebra of the sacral spine that adjoins the lumbar spine is named S1.

38.   A spinal fusion is an invasive surgical procedure that is performed to join (or "fuse") two or more vertebrae of the spine.

39.   Spinal implants may be used in connection with a fusion surgery to help stabilize the spine and facilitate the fusion.

40.   Physicians typically select the implantable device they use for surgical procedures prior to performing the surgery.  Hospitals typically purchase the selected devices directly from vendors, and are repaid for these (and other) costs by Medicare.

41.   A spinal implant must be cleared by the Food and Drug Administration (FDA) before a vendor can market that implant in interstate commerce.

42.   Companies can bypass the FDA's approval process if they can show that their proposed device is "substantially equivalent" to other commercially available devices.  *See generally* 21 U.S.C. § 360e(b)(1); 21 C.F.R. § 814.1(c)(1).

43.     The types of implants described in paragraphs 44-53 below, which Apex and Kronos sold to hospitals during the relevant period, were substantially equivalent to other widely available devices.

44.     A "cage" is an implant that is typically made of polyetheretherketone (PEEK) plastic, and that may be used in a fusion surgery to maintain space between the vertebral segments.

45.     Through Apex and Kronos, Reliance charged hospitals approximately $4,500 for each cage.

46.     A "pedicle screw" is a metal implant, typically made of titanium, which is implanted into the bones of the spine to facilitate the fixation of the spinal vertebrae. Screws are implanted into two or more adjacent spinal segments, and used to anchor "rods" or "plates."

47.     Through Apex and Kronos, Reliance charged hospitals approximately $1,000 for each screw.

48.     A "plate" is an implant that is used in connection with cervical procedures. A plate is anchored by screws and placed longitudinally along the front of the cervical spine.

49.     Through Apex and Kronos, Reliance charged hospitals as much as $2,400 for each plate.

50.     A "rod" is an implant that is anchored by pedicle screws, and that is placed longitudinally along the back of the lumbar and thoracic spine.

51.     Through Apex and Kronos, Reliance charged hospitals approximately $250 for each rod.

52.     A "crosslink" is an implant that can be used to establish a transverse connection between two rods.

53.     Through Apex and Kronos, Reliance charged hospitals approximately $1,000 for each crosslink.

### III.   THE ANTI KICKBACK STATUTE

54.    The AKS prohibits any person or entity from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, to induce or reward a person for, *inter alia*, purchasing, ordering, arranging for, or recommending the purchase or ordering of any goods or services for which payment may be made, in whole or in part, under a federal health program, including Medicare.  42 U.S.C. § 1320a-7b(b)(1),(2).

55.    The AKS seeks to ensure that referrals will be based on sound medical judgment, and that providers will compete for business instead of paying for referrals. The AKS is intended to prevent arrangements that can lead to the distortion of medical decision-making, overutilization of services and supplies, increased costs to federal health care programs, and unfair competition.

56.    For the purposes of the AKS, "remuneration" includes the transfer of anything of value, "directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b)(1).  In addition to the more obvious types of remuneration (e.g., cash payments), the statute also prohibits less direct forms of payment, such as providing the opportunity to earn money in exchange for services rendered, or providing investment opportunities or equity interests, particularly under economic terms that make the investment extremely advantageous, or where the provider has a substantial financial interest in generating business for the company in which he or she invests.

57.    The AKS's legislative history confirms Congress's intent to interpret the term "remuneration" broadly.  *See* 123 Cong. Rec. 30,280 (1977) (Statement of Rep. Rostenkowski), cited at 56 Fed. Reg. 35,952, 35,958 (July 29, 1991) (Final Rule regarding AKS Safe Harbors).

58.    The knowing and willful payment of remuneration to a physician – or the knowing and willful receipt of remuneration by a physician – violates the AKS when even one purpose of the transaction is to induce the referral – or generation – of federal

10

healthcare program-related business.

59.     The AKS provides that, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. § 1320a-7b(g).  This language clarifies "that all claims resulting from illegal kickbacks are considered false claims for purpose of civil action under the False Claims Act."  155 Cong. Rec. S10854 (statement of Sen. Leahy).

### A.  AKS Safe Harbors

60.     OIG has promulgated "safe harbor" regulations that define practices that are not subject to the AKS because such practices are unlikely to result in fraud or abuse.  *See* 42 C.F.R. § 1001.952.

61.     The AKS safe harbors operate as affirmative defenses to alleged violations of the statute.  To invoke a safe harbor successfully, a defendant bears the burden of proving that all of the conditions set forth in the applicable safe harbor have been met.

62.     Under the safe harbor for small investment interests, any payment to an investor that is a return on an investment does not constitute remuneration for purposes of the AKS if each of the safe harbor's eight requirements are satisfied.  *See* 42 C.F.R. § 1001.952(a)(2).

63.     In order to satisfy the safe harbor for small investment interests, no more than 40-percent of the entity's revenue may come from investor referrals.  *Id.* at § 1001.952(a)(2)(vi).

64.     Apex and Kronos did not satisfy the requirements of the safe harbor for small investments because nearly all of their revenue came from physician-investor referrals.

65.     For example, 99% of Kronos's revenues through July 2015 came from physician-investor referrals.

66.     At all relevant times, the Defendants were aware that Reliance's distributorships, including Apex and Kronos, did not satisfy the requirements of the safe harbor for small investment interests.

11

## B. OIG Advisory Opinions

67. Individuals and entities may seek an advisory opinion from the OIG to determine whether a specific business arrangement constitutes grounds for the imposition of sanctions under the AKS. *See* 62 Fed. Reg. 7350 (Feb. 19, 1997). Individuals and entities contemplating a business arrangement that could violate the AKS may avoid unnecessary risk by describing the arrangement and asking the OIG for an advisory opinion.

68. Defendants did not seek an advisory opinion from the OIG regarding the legality of Reliance's operations, or the operations of any of its distributorships, including Apex and Kronos.

## C. OIG Special Fraud Alerts and Related Guidance

69. The OIG issues Fraud Alerts to discuss "trends of health care fraud and certain practices of an industry-wide character." 59 Fed. Reg. 65,373 (Dec. 19, 1994). The purpose of these alerts is "to provide general guidance to the health care industry." *Id.* at 65,373.

70. Since 1989, OIG has issued a series of Alerts concerning joint venture arrangements with referring physicians that are "intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals." Special Fraud Alert: Joint Venture Arrangements (OIG-89-4), *reprinted in* 59 Fed. Reg. 65,372, 65,374 (Dec. 19, 1994). *See also* Special Fraud Alert: Physician-Owned Entities (Mar. 26, 2013), available at https://www.oig.hhs.gov/fraud/docs/alertsandbulletins/2013/POD_Special_Fraud_Alert.pdf. (visited Aug. 30, 2019).

71. At all relevant times, Defendants were aware of, possessed, and discussed information about the AKS's prohibitions, including the OIG guidance that warned against offering investment opportunities to physicians to induce those physicians to generate business.

# FACTS

## I.   DEFENDANTS' KICKBACK SCHEME

### A.  Reliance Medical Systems

72.     Bret Berry and Adam Pike formed Reliance on January 19, 2006.

73.     Reliance sells devices that are implanted in patients in spinal fusion surgeries.  It describes itself as a "manufacturer," offering an "array of surgeon-designed and surgeon-tested implants and instruments," as well as "engineering resources to help surgeons customize products in order to better suit their needs, their techniques, and their patients."

74.     In fact, Reliance is a holding company that Berry and Pike used to illegally expand their business by paying remuneration to physicians to incentivize them to use the spine devices Reliance sells in their surgeries.

75.     Reliance's profits were essentially guaranteed because the physicians to whom it paid remuneration controlled the choice of which implant they used in their surgeries, guaranteeing Reliance a captive stream of referrals.

76.     Reliance employed a variety of schemes to attempt to justify its payments to physicians.  During the first phase of its operations, from 2007 and 2012, Reliance operated a series of physician-owned distributorships (PODs) to collect and distribute the profits from the surgeries of its physician-investors.

77.     A POD is a physician-owned entity that derives revenue from selling, or arranging for the sale of, implantable medical devices.  Berry and Pike used Reliance to operate approximately one dozen PODs, including Apex and Kronos.

78.     Reliance's implants are indistinguishable in design from spine implants that are generally commercially available.

79.     In a May 2010 letter to a potential physician-investor, Mark Zidek – a Reliance distributor – described Reliance's devices as "customized implants and instruments to meet the individual needs of the surgeon."  In a subsequent email commenting on this letter, however, Zidek wrote, "I have never written so much

13

1    b***s*** in my life."

2        80.    Reliance does not actually manufacture the implants for which it has FDA

3    marketing clearance.  Instead, Reliance contracts with unaffiliated companies to create

4    the implants that it sells to hospitals.

5        81.    Prior to September 2007, Reliance did not have FDA clearance to sell its

6    own PEEK cages.

7        82.    All of Reliance's sales before September 2007 were of products designed

8    and made by other, unaffiliated spine companies.

9        83.    On September 27, 2007, Reliance obtained clearance through the FDA

10   Premarket Notification process to sell PEEK cages.

11       84.    Reliance represented to the FDA that its PEEK cage system is substantially

12   equivalent to systems made by Medtronic and Synthes.

13       85.    Prior to March 2009, Reliance did not have FDA clearance to sell its own

14   pedicle screw system.

15       86.    On March 26, 2009, Reliance obtained FDA clearance to sell a pedicle

16   screw fixation system consisting of rods, screws, and crosslinks.

17       87.    Reliance represented to the FDA that its pedicle screw system was

18   substantially equivalent to systems made by Medtronic, Stryker, and Synthes.

19       **B.  Apex Medical Technologies**

20       88.    Apex is a POD created to distribute Reliance implants.

21       89.    Bret Berry, Adam Pike, and John Hoffman formed Apex on September 15,

22   2008.

23       90.    In or around April 2010, Berry, Pike, and Hoffman offered Drs. Aria Sabit

24   and Sean Xie the opportunity to invest in Apex.

25       91.    In May 2010, Berry, Pike, Hoffman, and Drs. Sabit and Xie each paid

26   $5,000 for a twenty-percent (20%) ownership stake in Apex.

27       92.    In May 2010, the same month in which Drs. Sabit and Xie became

28   investors, Apex paid each of them $20,117 (*four times* the value of each physician's

14

capital investment).

93. Prior to April 2010 – when Dr. Sabit agreed to invest in Apex – Dr. Sabit never used Reliance implants.

94. Between April 2010 and December 2010, Dr. Sabit used Reliance implants in more than ninety-percent (90%) of his spinal fusion surgeries.

95. Between April 2010 and December 2010, Community Memorial Hospital in Ventura, California (Community Memorial) paid Apex $1,421,484 for the cost of the Reliance implants that Dr. Sabit used in his surgeries.

96. Through Apex, Berry, Hoffman, and Pike shared a portion of profits from devices sales to Community Memorial with Dr. Sabit.

97. The payments Berry, Hoffman, and Pike, through Apex, made to Dr. Sabit are set forth below:

| DATE | PAYMENT TO DR. SABIT |
| --- | --- |
| 5/31/10 | $20,117 |
| 6/30/10 | $20,755 |
| 7/31/10 | $54,235 |
| 8/31/10 | $43,292 |
| 9/30/10 | $35,896 |
| 10/31/10 | $25,572 |
| 11/30/10 | $35,747 |
| 12/31/10 | $29,343 |
| 1/31/11 | $12,628 |
| 4/30/11 | $12,839 |
| 5/31/11 | $11,620 |
| 6/30/11 | $15,315 |
| 7/31/11 | $21,982 |
| 8/31/11 | $12,924 |
| 9/30/11 | $2,835 |
| 10/31/11 | $10,880 |
| 11/30/11 | $1,845 |
| 12/31/11 | $11,716 |

| 2/29/12 | $14,618 |
| 3/31/12 | $16,154 |
| 4/30/12 | $10,156 |
| 5/31/12 | $5,056 |
| 6/30/12 | $13,045 |
| **TOTAL** | **$438,570** |

98.   Apex's payments to Dr. Sabit were based on profits he generated through sales of Reliance implants to hospitals where Dr. Sabit performed surgeries using those implants.

99.   Berry, Hoffman, and Pike reasonably could have foreseen that their payments to Dr. Sabit would cause him to perform spinal fusion surgeries using Reliance implants that were not medically necessary, or that were more extensive than what was necessary.

100.   In or around November 2010, Community Memorial conducted a review of Dr. Sabit's instrumented fusion surgeries and concluded that his "procedures represent a significant deviation from an appropriate standard of care."

101.   On December 3, 2010, Community Memorial suspended Dr. Sabit based on its conclusion that "immediate action must be taken to protect the life or well-being of patients or to reduce imminent danger to the life, health or safety of any person."

102.   On December 21, 2010, Dr. Sabit resigned from the medical staff at Community Memorial.

103.   When Dr. Sabit was still an Apex investor, Defendants Berry, Hoffman, and Pike became aware of news reports that several of Dr. Sabit's patients alleged that they suffered severe post-operative complications as a result of his unnecessarily invasive spinal fusion surgeries.

104.   Defendants Berry, Hoffman, and Pike took no action based on the news reports that several of Dr. Sabit's patients alleged that they suffered severe post-operative complications as a result of his unnecessarily invasive spinal fusion surgeries.

105.   In early 2011, Dr. Sabit obtained medical privileges at hospitals in the

16

Detroit, Michigan area.

106.   On November 15, 2011, and again on May 21, 2012, Reliance submitted vendor profile forms to Michigan hospitals where Dr. Sabit had obtained privileges certifying that no physician owned all or part of Apex.

107.   Defendants knew that their November 2011 and May 2012 vendor profile forms were false because Dr. Sabit remained an Apex investor until August 10, 2012.

108.   On November 21, 2014, the United States filed a criminal information in the United States District Court for the Eastern District of Michigan charging Dr. Sabit, *inter alia*, with health care fraud, in violation of 18 U.S.C. § 1349.  That criminal case is captioned *United States v. Sabit*, No. 2:14-cr-20779 (E.D. Mich.).

109.   On May 22, 2015, Dr. Sabit pleaded guilty to four counts of conspiracy to commit health care fraud and one count of unlawful distribution of a controlled substance.  *See United States v. Sabit*, ECF No. 73.

110.   As part of the factual basis for his plea agreement, Dr. Sabit (referred to in the agreement as "defendant") admitted, among other things, that:

- "every spine surgery that defendant … performed using spinal implant devices . . . Apex [between 2010 and 2012] was predicated on illegal kickback payments;"

- "Once defendant satisfied the Apex Co-Conspirators that his surgical volume was sufficient and that he was committed to using Apex implant devices in his surgeries, the Apex Co-Conspirators told defendant that they would invite him to invest in Apex;"

- "Apex generated revenue only by defendant and [Dr. Sean Xie, another Apex physician-investor] referring their Medicare and other patients for surgery and then requiring the hospitals and surgical centers where they performed those surgeries to purchase the implant devices they used in the surgeries from Apex;"

- "incentivized by this illegal kickback arrangement and his involvement in the conspiracy, defendant performed medically unnecessary surgeries;"

- "While defendant was involved with Apex, defendant and the Apex Co-

17

Conspirators intentionally ignored Anti-Kickback Statute compliance advice that they received from legal counsel as well as guidelines contained within Apex's operating agreements;"

- "the Apex Co-Conspirators pressured defendant to use Apex spinal implant devices in all or almost all of his surgeries;" and

- "the financial incentives provided to defendant by the Apex Co-Conspirators and Apex caused defendant to use more Apex spinal implant devices in surgery than were medically necessary to treat his patients in order to generate more sales revenue for Apex."

111.   The "Apex Co-Conspirators" referred to in the Sabit plea agreement are defendants Berry, Hoffman, and Pike.

## C.  Kronos Spinal Technologies

112.   Kronos is a POD created to distribute Reliance implants.

113.   Bret Berry, Adam Pike, and John Hoffman formed Kronos on or about February 27, 2007.

114.   In or around June 2007, Berry, Pike, and Hoffman offered Drs. Ali Mesiwala and David Lundin the opportunity to invest in Kronos.

115.   Between August 2007 and September 2008, Kronos paid Drs. Mesiwala and Lundin $769,800.

116.   Dr. Mesiwala paid nothing in exchange for his ownership interest in Kronos.

117.   Prior to April 2007, Dr. Mesiwala never used Reliance implants.

118.   Between 2007 and 2012, Dr. Mesiwala used Reliance implants in approximately seventy-percent (70%) of his spinal fusion surgeries.

119.   In or around 2008, Dr. Lundin announced his intention to leave his practice with Dr. Mesiwala and relocate to Washington State.

120.   After he announced his intention to leave California, Defendants forced Dr. Lundin to surrender his ownership interest in Kronos without compensation.

18

121.   Between October 2008 and November 2009, Dr. Mesiwala was Kronos's only physician-investor.

122.   Between October 2008 and November 2009, Kronos's profitability was based entirely on Dr. Mesiwala's use of Reliance devices in his own surgeries.

123.   Between October 2008 and November 2009, the profit distributions Dr. Mesiwala received from Kronos varied directly with, and were based solely on, his own use of Reliance devices.

124.   Defendants wanted to recruit a second physician-investor for Kronos, because they believed it was illegal to operate a POD with only one physician-owner.

125.   In or around mid-2009, Defendants evaluated Drs. Tiffany Rogers and Gowariharian Thaiyananthan as potential additional Kronos physician-investors.

126.   Dr. Rogers was not offered the opportunity to invest in Kronos because she had financial ties to other spine device companies.

127.   Even though Dr. Rogers was never a Kronos investor, Berry, Hoffman, and Pike both promised and paid her a share of the profits she generated for Kronos during the one month period she was being "evaluated" as a potential investor.

128.   In or around late-2009, Defendants offered Dr. Gowriharian Thaiyananthan the opportunity to invest in Kronos.

129.   On January 22, 2010, Defendants executed paperwork with Dr. Thaiyananthan creating the appearance that he had paid $100,000 in exchange for a twenty percent ownership interest in Kronos.

130.   In fact, Defendants redistributed Dr. Thaiyananthan's capital contribution back to him the same month he appeared to invest.

131.   On January 15, 2010 – one week *before* Dr. Thaiyananthan made a capital contribution to Kronos – Kronos paid Thaiyananthan $79,000.

132.   On January 31, 2010, one week after Dr. Thaiyananthan appeared to invest, Kronos paid him an additional $69,400.

133.   On the same month Dr. Thaiyananthan acquired an ownership interest in

19

1    Kronos, Kronos paid him back his capital contribution in full, plus an additional

2    $48,400.

3        134.   A record of Defendants payments to Dr. Mesiwala from August 2007 until

4    August 2013 is set forth below:

| DATE | PAYMENT TO DR. MESIWALA |
|------|--------------------------|
| 8/13/07 | $80,000[1] |
| 9/6/07 | $68,000 |
| 10/5/07 | $43,200 |
| 11/1/07 | $60,000 |
| 11/30/07 | $62,000 |
| 1/14/08 | $52,400 |
| 1/31/08 | $39,800 |
| 2/29/08 | $67,000 |
| 3/31/08 | $31,000 |
| 4/30/08 | $57,000 |
| 5/31/08 | $63,000 |
| 6/30/08 | $53,200 |
| 7/31/08 | $31,000 |
| 8/31/08 | $33,600 |
| 9/30/08 | $28,600 |
| 10/31/08 | $43,000 |
| 11/30/08 | $37,400 |
| 12/31/08 | $17,800 |
| 1/31/09 | $35,000 |
| 2/28/09 | $31,600 |
| 3/31/09 | $35,500 |
| 4/30/09 | $41,500 |
| 5/31/09 | $40,000 |
| 6/30/09 | $39,200 |
| 7/31/09 | $66,000 |

[1] Reliance's payments to Dr. Mesiwala between August 2007 and November 2008 were made to SoCal Medical Surgical.  A portion of these payments were shared with Dr. David Lundin.

| | |
|---|---|
| 8/31/09 | $48,600 |
| 9/30/09 | $52,700 |
| 10/31/09 | $56,200 |
| 11/30/09 | $69,100 |
| 1/15/10 | $79,000 |
| 1/31/10 | $69,400 |
| 2/28/10 | $68,200 |
| 3/31/10 | $54,500 |
| 4/30/10 | $79,700 |
| 5/31/10 | $53,363 |
| 6/30/10 | $58,627 |
| 7/31/10 | $75,474 |
| 8/31/10 | $38,419 |
| 9/30/10 | $54,958 |
| 10/31/10 | $51,113 |
| 11/30/10 | $69,900 |
| 12/31/10 | $64,043 |
| 1/31/11 | $21,450 |
| 2/28/11 | $50,976 |
| 3/31/11 | $37,852 |
| 4/30/11 | $39,414 |
| 5/31/11 | $11,093 |
| 5/31/11 | $20,000 |
| 6/30/11 | $23,552 |
| 7/31/11 | $45,344 |
| 8/31/11 | $36,850 |
| 9/30/11 | $32,466 |
| 10/31/11 | $57,423 |
| 11/30/11 | $44,417 |
| 12/31/11 | $48,709 |
| 1/31/12 | $66,463 |
| 2/29/12 | $38,089 |
| 3/31/12 | $24,861 |
| 4/30/12 | $49,462 |
| 5/31/12 | $40,636 |
| 6/30/12 | $37,179 |
| 7/31/12 | $24,448 |

| 8/31/12 | $47,839 |
|---------|---------|
| 9/30/12 | $101,789 |
| 2/1/13 | $51,000 |
| 3/1/13 | $30,300 |
| 4/1/13 | $40,350 |
| 5/1/13 | $47,400 |
| 6/1/13 | $21,900 |
| 7/1/13 | $52,050 |
| 8/1/13 | $30,600 |
| **TOTAL** | **$3,374,009** |

135.    Kronos's payments to Dr. Mesiwala were based on profits from sales of implants to hospitals where Dr. Mesiwala performed surgeries using Reliance implants.

136.    Between 2007 and 2013, Defendants paid Dr. Mesiwala an additional $323,009 based on profits he generated for Spine Biologics, LLC, another Reliance POD that Reliance used to funnel kickbacks to Dr. Mesiwala.

137.    As explained in Section D (paragraphs 141-173) below, Reliance continued to pay Dr. Mesiwala a share of profits he generated for Kronos by using Reliance implants in his own surgeries after August 2013.

138.    On or about 2014, Pomona Valley Memorial Hospital, one of the hospitals in which Dr. Mesiwala performed surgeries, conducted a retrospective assessment of his instrumented fusion surgeries using Reliance implants and concluded that "*Dr. Mesiwala performs surgeries that often exceed the medical necessity*" (emphasis added).

139.    On or about 2015, Dr. Mesiwala, through counsel, negotiated his resignation as a member of the Pomona Valley Memorial Hospital medical staff.

140.    Berry, Hoffman, and Pike reasonably could have foreseen that their payments to Dr. Mesiwala would cause him to perform spinal fusion surgeries that were not medically necessary, or that were more extensive than what was necessary.

### D.  Reliance's Sham Employment of Referring Physicians in 2013

141.    In December 2011, CMS announced proposed regulations implementing the

Transparency Reports and Reporting of Physician Ownership or Investment Interests (the "Sunshine Act") section of the Patient Protection and Affordable Care Act. 76 Fed. Reg. 78,742 (Dec. 19, 2011). The regulations implementing the Sunshine Act require device manufacturers, including PODs, to report annually to CMS information regarding payments, ownership, investment interests, and other transfers of value to physicians. *Id.* at 78,751-52; *cf.* 78 Fed. Reg. 9,458, 9,493 (Feb. 8, 2013) (final rule).

142. Defendants conspired with each other and with their physician-investors to avoid the disclosure requirements imposed by the Sunshine Act by repurchasing the equity of their physician-investors and then purporting to hire them as employees.

143. Bret Berry has stated that, "[t]he whole point" of Reliance's decision to end its ownership arrangement with physicians and employ its former physician-investors "was to avoid the sunshine act."

144. Berry and Pike knew of warnings from multiple attorneys that their plan to employ their former physician-investors might be found to be unlawful. For example:

- On October 17, 2012, William Meier, an attorney hired by a Reliance physician-investor to opine on the legality of Reliance's proposed employment arrangements, stated "I have considerable doubt that the proposed arrangement complies with applicable Texas law." This opinion was shared with Berry and Pike no later than October 17, 2012.

- On December 11, 2012, David Hirshfeld, at attorney hired by Reliance to opine on the legality of its proposed employment arrangements, stated that "[t]he proposed compensation arrangement might not withstand regulatory scrutiny." This opinion was shared with Berry and Pike no later than December 11, 2012.

145. In spite of attorneys' warnings, Berry, Hoffman, and Pike hired many of its former physician-investors as salaried "employees" on or before January 2013.

146. Berry, Hoffman, and Pike hired Dr. Mesiwala as Kronos's "Vice President of Cervical Products" on September 15, 2012.

147. Dr. Mesiwala's responsibilities as a Kronos employee did not include

providing items or services for which payment may be made under Federal healthcare programs.

148.   Dr. Mesiwala's base pay as a Kronos employee was $600/hour.

149.   Reliance instructed Dr. Mesiwala how much time to report each month when he was a Kronos employee.

150.   Based on Reliance's instructions, Dr. Mesiwala submitted timesheets claiming to work an average of 75.25 hours per month for Reliance distributorships (including Kronos) in the first half of 2013.

151.   In fact, Dr. Mesiwala's timesheets grossly overstated the amount of time he spent working for Kronos.

152.   In deposition testimony in a medical malpractice proceeding, Dr. Mesiwala admitted that his best estimate was that he spent no more than ten hours per month working on activities for Reliance in 2013.

153.   Berry, Hoffman, and Pike were aware that the hours Dr. Mesiwala reported in his 2013 timesheets were based on the profits he generated for Kronos, and not the time he spent working.

154.   Dr. Mesiwala's job description with Kronos states that the primary focus of his work would be related to improving the clinical safety of Reliance's cervical products.

155.   In fact, nearly all of the work Dr. Mesiwala claimed to do for Kronos in 2013 was creating short summaries of academic articles selected by Reliance.

156.   Attorneys instructed Defendants that the services provided by physician-employees must be "reasonable and necessary," and that they *must "not be duplicative* of services provided by physicians employed by other related entities" (emphasis added).

157.   In spite of this admonition, nearly all of the work Dr. Mesiwala was assigned was duplicative of tasks assigned to other Reliance physician-employees.  In fact, in several instances Dr. Mesiwala's work was duplicative of work he had claimed to perform in previous months.

158.   For example, Reliance assigned Dr. Mesiwala to review and summarize a single academic article – R. Heary, O. Choudhry, D. Jalan, and N. Agarwal, *Analysis of Cervical Sagittal Alignment After Screw-Rod Fixation*, 72:6 Neurosurgery (June 2013) – four times in four consecutive months.

159.   Dr. Mesiwala filled out paperwork purporting to summarize this article on four separate occasions:  6/29/13, 7/16/13, 8/7/13, and 9/22/13.

160.   Dr. Mesiwala's duplicative summaries of the *Cervical Sagittal Alignment* article did not reference each other or otherwise explain why he was reviewing and summarizing the same article four times in consecutive months.

161.   Reliance routinely assigned its physician-employees to provide multiple, duplicative summaries of the same academic articles to create the appearance that these physicians were spending significant time working for their former POD.

162.   For instance, eleven different Reliance physician-employees claimed to have summarized the *Cervical Sagittal Alignment* article on twenty-one separate occasions in 2013.

163.   Reliance attempted to create the appearance that these physicians were spending significant time working for their former PODs to disguise Reliance's payments for referrals after 2013.

164.   Even after Dr. Mesiwala supposedly became an "employee" of Kronos, Kronos's payments to him continued to be based on the profits he generated for Kronos through the use of Reliance implants in his surgeries, rather than the amount of any work that he did for Kronos.

165.   To disguise the fact that Reliance was still paying Dr. Mesiwala a share of the profits he generated for Kronos, Reliance delayed its profit distributions to him for two months.

166.   As an illustration, the following chart describes the revenues and profits Dr. Mesiwala generated for Kronos in January 2013, and Defendants' distribution of those profits over time:

| dates | 12-Dec | 13-Jan | 13-Feb | 13-Mar | 13-Apr |
|-------|--------|--------|--------|--------|--------|
| sales gross | | $190,965.00 | | | |
| sales net | | $161,947.85 | | | |
| | | | | | |
| Mesiwala | | $ - | | | $ 40,350.00 |
| Pike | | | $ 40,486.00 | | $ - |
| Berry | | | $ 40,486.00 | | $ - |
| Hoffman | | | $ 40,486.00 | | $ - |

167.   In other words, Defendants' $40,350 "salary" payment to Dr. Mesiwala in April 2013 was based on the net profits Dr. Mesiwala generated for Kronos in January, and not based on any "work" he did for Kronos in March.

168.   Defendants conspired with each other to create false timekeeping records to justify Kronos's profit distributions to Dr. Mesiwala after he became a Kronos employee.

169.   At the start of each month in 2013, Reliance instructed Dr. Mesiwala both as to the number of hours he should claim for the month and as to the academic articles he should claim to have reviewed to support those claimed hours.

170.   Reliance's instructions to Dr. Mesiwala as to how many hours to claim for each month were based on Dr. Mesiwala's share of the profits from previous months.

171.   To justify the above-referenced April 2013 payment of $40,350, Reliance instructed Dr. Mesiwala to claim 67.25 hours for Kronos in March – the exact number that, when multiplied by his $600 hourly rate, would lead to a monthly payment of $40,350.

172.   Consistent with Reliance's instructions, Dr. Mesiwala submitted timesheets claiming to have worked 67.25 hours for Kronos in March 2013.

173.   Defendants later came to regret their decisions to buy-out and then employ their former physician investors, stating, in a lawsuit against the government, that "Reliance wishes to return to physician ownership," and that it "wants to speak immediately to physicians . . . about forming new physician-owned entities."

## II.   ADDITIONAL EVIDENCE OF DEFENDANTS' UNLAWFUL PURPOSE

174.   Defendants were aware of the AKS – and of the legal guidance concerning the AKS – when they formed Reliance and its distributorships.

175.   Specifically, Defendants were advised by attorneys – and were personally aware – that multiple Federal courts have held that the AKS covers any arrangement where one purpose of that arrangement is to obtain money for the referral of services or to induce further referrals.

176.   Defendants' internal documents describe their purpose as generating profits from physician-investor referrals.

177.   Adam Pike was recorded describing Reliance's PODs to a potential physician-investor as follows:  "I always scoff at someone I'm sitting with that says well it's really not about the money ah b***s***, it is about the money. We make a lot of money."

178.   During this same recorded encounter, Pike stated he would pay the potential physician-investor "more money than your practice does."  Pike added that the potential physician-investor's share of the profits he would help to generate would be sufficient to "raise [his] kids with this nice income and and [sic.] the first month or two go ahead and buy their college education."

179.   On July 26, 2011, Adam Pike was recorded stating that he and Bret Berry founded Reliance as part of a plan to "get around" the AKS.  Specifically, Pike stated, "Bret and I started this coming out of MBA school together. We were *we were aware of Stark and Anti-Kickback* and we knew those existed *and we devised a plan around those*." (emphasis added).

180.   As described in Sections A-F (paragraphs 183 to 239) below, Defendants were advised by multiple attorneys that Reliance's network of PODs should not engage in certain conduct that the OIG has described as "suspect" under the AKS.

181.   In response to their attorneys' advice, Defendants adopted compliance plans

appearing to incorporate aspects of the OIG guidance concerning the AKS.

182.   Defendants promulgated these plans to create the appearance that their companies were being operated lawfully; however, Defendants routinely acted contrary to their stated compliance rules.

## A.  Minimal or Non-Existent Capital Contributions

183.   OIG's guidance states that an investment may be deemed suspect under the AKS where the amount of capital that participants invest is disproportionately small in comparison to the return on investment.  *See* Special Fraud Alert:  Joint Venture Arrangements (Joint Venture SFA), *reprinted in* 59 Fed. Reg. 65,373 (Dec. 19, 1994).

184.   Defendants were aware of, possessed, and discussed the OIG guidance stating that an investment may be deemed suspect under the AKS where the amount of capital that participants invest is disproportionately small in comparison to the return on investment.

185.   On multiple occasions, Reliance, Berry, Hoffman, and Pike were advised by attorneys that their physician-investors should be required to make substantial capital contributions in order to invest in Reliance's PODs.

186.   Defendants purported to adopt their attorneys' advice, promulgating "compliance plans" that stated that Reliance's PODs "will be adequately capitalized for [their] operations through the initial capital contributions of [their] . . . [i]nvestors and the *Physician Investors' investments will not be nominal*" (emphasis added).

187.   Contrary to this advice, Defendants routinely allowed physicians to invest in Reliance PODs without requiring a substantial capital investment, and in many cases they permitted physicians to invest without requiring any capital investment at all.

188.   Dr. Sabit paid $5,000 in exchange for his Apex investment, and was subsequently paid $264,957 in the eight-month period after he became an Apex investor.

189.   Dr. Mesiwala paid *nothing* in exchange for a 20-percent ownership interest in Kronos, and Reliance paid him an average of more than $500,000 per year between 2007 and 2012.

## B.  Concealment of Financial Relationships

190.   OIG's guidance concerning the AKS states that an investment may be deemed suspect under the AKS where physician-owners actively conceal through misrepresentations their ownership interests in a POD.  *See* Special Fraud Alert: Physician-Owned Entities (POD SFA) (Mar. 26, 2013).

191.   Defendants were aware of, possessed, and discussed the OIG guidance stating that an investment may be deemed suspect under the AKS where physician-owners actively conceal through misrepresentations their ownership interest in a POD.

192.   Reliance, Berry, Hoffman, and Pike were advised by attorneys that they should notify interested parties, including patients, of Reliance's financial relationships with its physician-investors.

193.   In spite of this legal advice, Berry, Hoffman, and Pike concealed, and conspired with Drs. Sabit and Mesiwala to conceal, their financial relationships with physicians.

194.   As Pike stated on multiple occasions, Defendants wanted to keep their financial arrangements with referring physicians "under the radar."

195.   As Berry explained, "Our job is . . . to let everybody outside . . . of our group think that you're just using this product . . . *We don't want anyone to know that you're an owner*" (emphasis added).

196.   One way that defendants concealed their financial relationship with referring physicians was through what they described to potential investors as a mandatory "evaluation period."

197.   As Pike and Berry stated:

PIKE:  also [the evaluation period is] a nice buffer time [sound of a car starting] for when the competitors come to you or the hospital staff comes to you and asks about this company you're not an owner.

BERRY:  You have no finances-

PIKE:  You don't have to se-you don't have to disclose anything.

198.   During this same meeting, Pike told the potential physician-investor, "So

hypothetically, [first name of confidential informant], you start u-utilizing Kronos products here and you're evaluating it and we we arrive to a point where we wanna sign you up and everyone's happy um *the hospital doesn't need to know* that.  The community doesn't need to know that.  The ca competitors don't need to know that.  No one knows but our own circle" (emphasis added).

199.   As part of their efforts to conceal their payments to referring physicians, Defendants made a series of false statements to hospitals that inquired about Reliance's financial ties to physicians.

200.   In November 2011 and May 2012, Reliance made false statements to a Michigan hospital in which Dr. Sabit performed surgeries, stating that no "physicians licensed to practice medicine . . . own all or part of [Apex]."  At the time Reliance submitted these false statements, Dr. Sabit, who was on the hospital's surgical staff, owned twenty percent of Apex.

201.   In September 2012, in response to an inquiry from a California hospital, Reliance stated that Dr. Ali Mesiwala "is not a distributor for Kronos Spinal Technologies, *nor has he received any payments or remunerations from Kronos Spinal Technologies as a consultant or investor*" (emphasis added).  This statement was false because Kronos had paid Dr. Mesiwala more than $3 million at the time this letter was signed.

202.   In addition to their own efforts to actively conceal Reliance's financial relationships with referring physicians, Berry, Hoffman, and Pike also discouraged their physician-investors from disclosing their financial relationships with Reliance to the hospitals in which they performed surgeries.

203.   Dr. Mesiwala also made a series of misleading or false statements about his financial relationship with Kronos.

204.   In sworn interrogatory answers executed in December 2011 in a medical malpractice lawsuit, Dr. Mesiwala stated that his relationship with Kronos was limited to "design[ing] surgical tools" for the company. This statement was false.

30

205.   In or around March 2012, Dr. Mesiwala was questioned by the Medical Executive Committee at Pomona Valley Memorial Hospital, and he once again denied having any financial relationship with Kronos.

206.   On December 13, 2012, Dr. Mesiwala gave deposition testimony denying that he had any financial relationship with Kronos and stating instead that he "did some consulting work for [that] company," which consisted of his "design[ing] . . . two tools . . . and had received compensation for that."  Both of these statements were false.

207.   Dr. Aria Sabit also made a series of false statements about his financial relationship with Apex, including the following:

- In 2010, Dr. Sabit was questioned by staff at Community Memorial regarding his financial interest in Apex, and he denied having any financial relationship with Apex;

- In 2010, Dr. Sabit was also questioned by his employer, Dr. Moustapha Abou-Samra, and he again denied having any financial relationship with Apex;

- In 2013, Dr. Sabit had an in-person meeting with Dr. Michael McKenna, the Chief Medical Officer of a hospital in which Dr. Sabit performed surgeries.  In the meeting, Dr. Sabit falsely stated that he had discontinued his financial relationship with Apex prior to acquiring staff privileges at that hospital; and

- On multiple occasions, including on November 12, 2012, Dr. Sabit gave sworn deposition testimony falsely claiming to be unfamiliar with Apex and denying that he had ever had a financial relationship with any medical device company.

### C.  Coercion of Hospital Payors

208.   OIG's guidance states that that an investment may be deemed suspect under the AKS where physician-owners coerce hospitals' purchase of the POD's devices by conditioning their performance of surgeries at those hospitals on such purchase.  *See* POD SFA.

209.   Defendants were aware of, possessed, and discussed the OIG guidance stating that an investment may be deemed suspect under the AKS where physician-

owners condition their referrals to hospitals on the hospitals' purchase of the POD's devices through coercion.

210.   Defendants adopted compliance plans stating that "Physician Investors" will not exert pressure on hospitals or surgery centers to purchase the devices from the company.

211.   The legal advice on which Defendants purported to rely in formulating this plan included a memo prepared by Hooper, Lundy & Bookman that stated "[a]ny effort by surgeons to overcome [hospital] reluctance through 'arm twisting' in one form [or] another would increase the legal risk, *and it is critical that surgeons not threaten to take their cases elsewhere* if a hospital will not contract with their Distributor." (emphasis added).

212.   In spite of this legal advice – and Defendants' own compliance plans – Berry, Hoffman, and Pike regularly told their physician-investors to "push" the hospitals where they performed surgeries to agree to purchase Reliance implants.

213.   Berry, Hoffman, and Pike regularly asked Reliance's physician-investors to "push" hospitals refusing to purchase Reliance implants, and threatened such hospitals with the loss of scheduled surgeries to induce them to pay above-market prices.

214.   At the request of Berry, Hoffman, and Pike, Reliance's physician-investors regularly threatened to move their scheduled surgeries away from hospitals that would not purchase Reliance implants, or that would not pay Reliance's proposed prices.

### D.  Forced Buyouts of Low-Referring Physicians

215.   OIG's guidance states that an investment may be deemed suspect under the AKS where physician-owners are required to arrange for the purchase of the devices sold by the POD or experience negative repercussions such as required divestiture for failure to use the POD's devices.  *See* Joint Venture SFA.

216.   Defendants were aware of, possessed, and discussed the OIG guidance stating that an investment may be deemed suspect under the AKS where physician-owners are required to arrange for the purchase of the devices sold by the POD or

experience negative repercussions such as required divestiture for failure to use the POD's devices.

217.   In or around 2011, Defendants adopted compliance plans stating that "No Physician Investor's investment interest (i.e., membership Unit) will be subject to repurchase for failure to use the Company's devices in such physician's surgeries."

218.   In spite of this, Defendants terminated investment arrangements with physician-investors who failed to generate sufficient profits by using Reliance devices.

219.   With the approval of Dr. Mesiwala, Defendants forced Dr. Gowaranthayan Thaiyananthan to surrender his shares in Kronos without compensation based on his failure to use a sufficient number of Reliance implants in his surgeries.

220.   Dr. Thaiyananthan was not consulted in advance of Defendants decision to terminate his Kronos investment.

221.   With the approval of Dr. Mesiwala, Defendants forced Dr. Lundin to surrender his shares in Kronos without compensation based on his plan to move to Washington State, where Reliance did not sell implants.

222.   Dr. Lundin objected to Defendants decision to terminate his Kronos investment.

### E.  Physician Selection

223.   OIG's guidance concerning the AKS states that an investment may be deemed suspect under the AKS when investors are selected because they are in a position to generate substantial business for the entity.  *See* Joint Venture SFA.

224.   Defendants were aware of, possessed, and discussed the OIG guidance stating that an investment may be deemed suspect under the AKS when investors are selected because they are in a position to generate business for the entity.

225.   Nevertheless, Defendants targeted physicians who agreed to a *quid pro quo* arrangement to use Reliance's devices in their surgeries in exchange for a share of the profits they generated.

33

226.   On July 26, 2011, Pike was recorded stating, "We [Reliance] don't share this with everyone . . . we handpick who we work with."

227.   In the same recording, Pike also stated that Reliance insisted on "evaluating" physicians before they were permitted to invest, describing this "evaluation" as "mandat[ory.]"

228.   Defendants expected potential physician-investors (and, later, physician-employees) to use Reliance's implants in their surgeries during this "evaluation period."

229.   As stated by Pike, "The evaluation phase is is for a couple of reasons.  It lets you get familiar with the product.  It let, let's you get familiar with us as a company and visa-versa.  We get familiar with you, we better understand your hospital.  We better understand your volume and your commitment to it and then when we all agree and- and the signing date comes then it's we know what we got, everybody knows.  There's no there's no question mark."

230.   Dr. Mesiwala was recorded telling a potential Kronos physician-investor that "the expectation is" that he would use his "own stuff," *i.e.*, Reliance implants.

231.   Pike remarked that Reliance would typically "like to see 8-10 cases under [a potential physician-investors'] belt before signing."

232.   Hoffman was recorded stating that a particular surgeon was not invited to become an investor because that surgeon was "not busy."

233.   Indeed, Pike has stated that physicians would be required to perform *lumbar* fusions (which are more profitable and pose a greater risk of patient harm) in order to invest.  As stated by Pike, "A couple of ACDF's [anterior cervical discectomy and fusions] with no other substance won't be worth it."

234.   In additional to expecting potential physician-investors to use Reliance implants in their surgeries when they were "evaluated," Defendants also expected physician-investors to demonstrate "dedication" and "loyalty" to Reliance after the "evaluation period" was over.  As stated by John Hoffman, "loyalty's a big factor" for Defendants when they decide who should be permitted to invest.

235.   The "dedication" and "loyalty" that Defendants expected from their physician-investors included their commitment to regularly use Reliance implants in their own surgeries.

### F.  Other Instances when Defendants Ignored Legal Advice

236.   Defendants disregarded the legal advice they received concerning the requirements and prohibitions of the AKS in multiple other ways.

237.   In a February 2010 email, Adam Pike acknowledged that "[W. Bradley] Tully [an attorney at Hooper, Lundy & Bookman], the attny that basically wrote legislation regarding surgeon ownership, is claiming [Reliance's PODs] to be too risky for the hospital."  On February 24, 2010, Dr. Ramin Raidzdeh, a Reliance physician-investor, reiterated that "Tully is not coming thru, and is suggesting several road blocks."

238.   In a February 2010 email, Pike rejected his partners' request to learn more about Mr. Tully's concerns, stating "*we already know the answers*.  We would be paying 2 attorneys at this point.  I am sick of paying attorneys" (emphasis added).

239.   Based on Pike's assurance that he "already knows" why Mr. Tully had refused to endorse Reliance's business model, Berry, Hoffman, and Pike declined to authorize their attorneys to inquire about Tully's specific reservations.

### III.   DEFENDANTS' KNOWLEDGE OF PHYSICIAN-INVESTOR OVERUTILIZATION

240.   Berry, Hoffman, and Pike reasonably could have foreseen that their payments to Reliance's physician-investors and physician-employees would cause them to perform spinal fusion surgeries using Reliance implants that were not medically necessary, or that were more extensive than what was necessary.

241.   Pike and Berry were aware when their physician-investors increased the rate at which they performed spinal fusion surgeries, and when their spinal fusion surgeries became more extensive (and therefore more risky to the patient) over time.

242.   Twenty-five of Reliance's thirty-five physician-investors, including Drs. Sabit and Mesiwala, increased the rate at which they performed instrumented fusion

1   surgeries on Medicare patients after they became Reliance physician-investors.

2   243.   Defendants generated daily surgery reports detailing the numbers and types

3   of surgeries that its physician-investors performed using Reliance implants.  Berry and

4   Pike carefully reviewed these reports.

5   244.   In emails circulating these daily reports, Reliance employees would include

6   editorial comments celebrating when Reliance physician-investors were performing an

7   unusually high number of surgeries.

8   245.   Berry and Pike also sent emails celebrating when physician-investors

9   scheduled extensive (and therefore risky) instrumented fusion surgeries.

10  246.   Defendants were aware that physicians on the Pomona Hospital surgical

11  staff had publicly criticized Dr. Mesiwala for performing medically unnecessary and

12  unnecessarily extensive spinal fusion surgeries.

13  247.   Defendants took no action to prevent Dr. Mesiwala from overutilizing

14  Reliance implants in order to generate additional profits after they became aware that he

15  had been publicly accused of performing medically unnecessary and unnecessarily

16  extensive spinal fusion surgeries.

17  248.   Defendants became aware of newspaper reporting alleging that Dr. Sabit

18  performed medically unnecessary spinal fusion surgeries when Dr. Sabit was still an

19  Apex investor.

20  249.   Defendants took no actions to end their financial arrangement with him

21  until June 2012 (more than one year after he was forced to resign from Community

22  Memorial).

## IV.   OTHER EVIDENCE OF DEFENDANTS' PROFITS AND PRACTICES

25  250.   Apex and Kronos distributed all profits to investors – including Berry,

26  Hoffman, and Pike – on a monthly basis.

27  251.   On July 26, 2011, Pike was recorded telling a potential physician-investor

28  that no one can "come after" Reliance because "there's no money in the account."

252.   From June 2007 to the present, Berry, Hoffman, and Pike each received and retained a share of the profits that physician-investors generated for Apex and Kronos.

253.   Berry, Hoffman, and Pike formed six different companies through which they owned their shares in Apex, Kronos, and other Reliance PODs.  The sole purpose of these companies was to receive profit distributions from Reliance PODs, and to pass the profits on to Berry, Hoffman, and Pike.

254.   Through Reliance's network of PODs, Berry, Pike and Hoffman distributed a combined total of approximately $43 million to themselves between June 2007 and December 2012.

255.   Reliance conducts business from its owners' personal email accounts, and Berry and Pike routinely delete emails concerning Reliance and its PODs from these accounts.

256.   Pike was personally served with an investigative subpoena on February 14, 2013.  After receiving the United States' subpoena, Pike deleted substantially all emails concerning Reliance and its distributorships that he sent and received during the period at issue in this Amended Complaint.

## V.   MEDICARE CLAIMS

257.   Between April 1, 2010, and December 31, 2010, Dr. Sabit presented 44 claims for payment to Medicare for instrumented fusion procedures he performed using Reliance implants.

258.   Dr. Sabit was paid $220,376 by Medicare for his professional services in connection with instrumented spinal fusion procedures he performed at Community Memorial using Reliance devices while he had a financial interest in Apex.

259.   Community Memorial received approximately $960,636 from Medicare for hospital services it provided in connection with fusion surgeries that Dr. Sabit performed using Reliance implants while he was an Apex investor.

260.   Between January 1, 2010 and April 30, 2014, Dr. Mesiwala presented 21 claims for payment to Medicare for instrumented fusion procedures he performed at

Pomona Valley using Reliance implants.

261.   Dr. Mesiwala was paid $101,812.41 by Medicare for his professional services in connection with instrumented spinal fusion procedures he performed at Pomona Valley using Reliance implants while he had a financial relationship with Kronos.

262.   Pomona Valley received approximately $919,649.08 from Medicare for hospitals services in provided in connection with fusion surgeries that Dr. Mesiwala performed using Reliance implants while he has a financial relationship with Kronos.

263.   By way of example, Defendants caused to be presented to Medicare the following false or fraudulent claims for surgical procedures using Reliance implants that were performed by Apex and Kronos physician-investors, and for the hospital services that were provided in connection with those surgical procedures:

### A.  "Patient A"

264.   On July 8, 2010, Dr. Sabit performed an instrumented fusion surgery at Community Memorial on "Patient A," a Medicare patient.[2]

265.   At the time he operated on Patient A, Dr. Sabit was an Apex physician-investor.

266.   Dr. Sabit ordered Reliance implants for his surgery on Patient A.

267.   Dr. Sabit performed a T7-L2 (i.e., a seven-level) laminectomy and fusion on Patient A where only a two-level surgery without fusion was indicated.

268.   Dr. Sabit submitted claims for payment to Medicare for professional services in connection with his surgery on Patient A, and Medicare paid him $8,589 for this surgery.

269.   Community Memorial submitted claims for payment to Medicare for the

---

[2] The United States will supply detailed information identifying these claims to defendants –including patient name, HIC number, payer, claim number, procedure performed, related hospital services provided, diagnosis code, date of service, date the claim was submitted, amount claimed, and amount paid – upon entry of an appropriate protective order.

hospital services it provided in connection with Dr. Sabit's surgery on Patient A, and Medicare paid Community Memorial $24,139 for those services.

270.   Community Memorial, in turn, paid Apex $20,744 for the Reliance implants Dr. Sabit used in his surgery on Patient A.

271.   Dr. Sabit's surgery on Patient A resulted in significant post-operative complications, including excessive blood loss and severe post-operative pain.  A second surgery was required to remove all the Reliance hardware that Dr. Sabit had implanted.

### B. "Patient B"

272.   On November 6, 2010, Dr. Sabit performed a C4-C7 fusion surgery on "Patient B," a Medicare patient, at Community Memorial.

273.   At the time he operated on Patient B, Dr. Sabit was an Apex physician-investor.

274.   Dr. Sabit ordered Reliance implants for his surgery on Patient B.

275.   Dr. Sabit performed a complete corpectomy of C5 even though there was minimal subluxation of C4 on C5, and at most a discectomy and fusion was indicated at that level.

276.   Dr. Sabit submitted claims to Medicare for professional services in connection with his surgery on Patient B, and Medicare paid him $4,861 for this surgery.

277.   Community Memorial submitted claims for hospital services it provided in connection with Dr. Sabit's surgery on Patient B, and Medicare paid Community Memorial $13,033 for those services.

278.   Dr. Sabit's surgery on Patient B failed, and all of the Reliance hardware that Dr. Sabit implanted had to be removed at a different hospital.

### C. "Patient C"

279.   On October 7, 2010, Dr. Sabit performed an instrumented fusion surgery on "Patient C," a Medicare patient, at Community Memorial.

280.   At the time he operated on Patient C, Dr. Sabit was an Apex physician-investor.

281.   Patient C suffered from multiple co-morbidities at the time of Dr. Sabit's surgery, including morbid obesity, diabetes, atrial fibrillation, and anemia.

282.   Dr. Sabit ordered Reliance implants for his surgery on Patient C.

283.   Dr. Sabit performed a L3-S1 interbody fusion on Patient C, even though the indications for fusion were completely absent.

284.   Dr. Sabit submitted claims to Medicare for professional services in connection with his surgery on Patient C, and Medicare paid him a total of $8,209 for these claims.

285.   Community Memorial submitted claims for hospital services it provided in connection with Dr. Sabit's surgery on Patient C, and Medicare paid Community Memorial $43,082 for those services.

286.   Community Memorial, in turn, paid Apex $26,219 for the Reliance implants Dr. Sabit used in his surgery on Patient C.

287.   Patient C had immediate post-operative complications.  She was not discharged from Community Memorial until October 15, 2010 – over one week after the surgery.  Patient C was readmitted for post-operative infections on October 19, 2010, and died on May 31, 2011.

### D.   "Patient D"

288.   On February 4, 2013, Dr. Ali Mesiwala performed an instrumented fusion surgery on "Patient D," a Medicare patient, at Pomona Valley Hospital.

289.   Patient D had multiple comorbidities, including obesity, hypothyroidism, atrial fibrillation, and hypertension.  She had previously had a coronary artery bypass, and she was a one-pack-per-day smoker.  She was 75-years old at the time Dr. Mesiwala operated on her.

290.   Dr. Mesiwala was a Kronos employee when he operated on Patient D.

291.   Dr. Mesiwala diagnosed Patient D with progressive scoliosis, when in fact the scoliosis was stable and without progression.

292.   Patient D was seen by different cardiologists preoperatively, only one of

whom would clear her medically for surgery.  The cardiologist who ultimately cleared her for surgery indicated that "in view of significant cardiac history the patient is at high risk for perioperative events."

293.   Dr. Mesiwala performed an anterior lumbar interbody fusion from L5-S1, and a posterior spinal instrumented fusion from T8 to the ilium on Patient D.

294.   Dr. Mesiwala ordered Reliance implants for his surgery on Patient D.

295.   The surgery Dr. Mesiwala performed was more extensive than necessary given that Patient D's scoliosis was not progressive.  At most, a selective laminectomy or decompression without fusion was indicated.

296.   Patient D suffered life-threatening post-operative complications, including pyelonephritis and infection, which required three additional weeks of hospitalization and eight months of treatment.

297.   Dr. Mesiwala submitted claims to Medicare for professional services in connection with his surgery on Patient D, and Medicare paid him a total of $9,926.83 for these claims.

298.   Medicare also paid Pomona Valley Hospital, in Pomona, California, $75,502.82 for hospital services in connection with Dr. Mesiwala's surgery on Patient D.

### E.   "Patient E"

299.   On May 18, 2013, Dr. Mesiwala performed an instrumented fusion surgery on "Patient E," a Medicare patient, at Pomona Valley Hospital.

300.   Patient E was 81 years old at the time Dr. Mesiwala operated on her, and had multiple comorbidities.

301.   Dr. Mesiwala was a Kronos employee when he operated on Patient E.

302.   Dr. Mesiwala diagnosed Patient E with a T7 fracture with 45-degree kyphosis, when in fact the kyphosis at the fracture was 10- to 20-degrees (which is considered minimal) and the patient's only clinical symptom was back pain.

303.   Dr. Mesiwala performed a multiple level fusion on Patient E.

304.   Dr. Mesiwala ordered Reliance implants for his surgery on Patient E.

305.   The surgery Dr. Mesiwala performed was more extensive than necessary. At most, a kyphoplasty was indicated.

306.   Patient E suffered post-operative complications as a result of Dr. Mesiwala's unnecessarily extensive surgery.

307.   Dr. Mesiwala submitted claims to Medicare for professional services in connection with his surgery on Patient E, and Medicare paid him a total of $1,693.73 for these claims.

308.   Medicare also paid Pomona Valley Hospital, in Pomona, California, $59,269.85 for hospital services in connection with Dr. Mesiwala's surgery on Patient E.

## COUNT I

**Against Reliance, Apex, Berry, Hoffman, and Pike**

**False Claims Act:  Presentation of False or Fraudulent Claims**

**31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) (2009)**

309.   The United States re-alleges and incorporates herein by reference paragraphs 1- 308.

310.   Defendants Reliance, Apex, Berry, Hoffman, and Pike knowingly caused Apex physician-investors and hospitals where those physician-investors performed surgeries to present claims for payment to Medicare for surgical procedures and related hospital services that were false or fraudulent, and not payable, because said Defendants, through Apex, knowingly and willfully paid the physician-investors remuneration in order to induce them to order and use Reliance implants, in violation of the AKS. Further, said Defendants actually knew, deliberately ignored, or recklessly disregarded the fact that the physician-investors and hospitals where the physician-investors performed surgeries were submitting claims for payment to Medicare that were false or fraudulent, and not payable, because they were tainted by kickbacks.

311.   Defendants Reliance, Apex, Berry, Hoffman, and Pike caused the presentation of the following claims to Medicare that were false or fraudulent, and not payable:  All of the claims for payment presented to Medicare by Apex's physician-

42

investors for surgical procedures using Reliance implants between April 2010 and July 2012, and all of the claims presented to Medicare for the related hospital services by the hospitals where Apex's physician-investors performed those procedures.

312.   In addition to and independent of said Defendants' violations of the AKS, these Defendants also knowingly caused Apex's physician-investors and their hospitals to present claims for payment to Medicare that were not payable, and were false and fraudulent because certain of the spinal fusion surgeries using Reliance implants were not medically necessary or were more extensive than what was necessary.  These Defendants knew that the payments made to Apex's physician-investors caused these physicians and their hospitals to perform and submit claims to Medicare for surgeries using Reliance implants and related hospital services that were not medically necessary and/or more extensive than what was necessary.

313.   By virtue of these false or fraudulent claims for payment, the United States suffered damages in an amount to be determined at trial.

**COUNT II**

**Against Reliance, Kronos, Berry, Hoffman, and Pike**

**False Claims Act:  Presentation of False or Fraudulent Claims**

**31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) (2009)**

314.   The United States re-alleges and incorporates herein by reference paragraphs 1-308.

315.   Defendants Reliance, Kronos, Berry, Hoffman, and Pike knowingly caused Kronos physician-investors and physician-employees – and hospitals where those physicians performed surgeries – to present claims for payment to Medicare for surgical procedures and related hospital services that were false or fraudulent, and not payable, because said Defendants, through Kronos, knowingly and willfully paid the physicians remuneration in order to induce them to order and use Reliance implants, in violation of the AKS.  Further, said Defendants actually knew, deliberately ignored, or recklessly disregarded the fact that Kronos physician-investors and physician-employees – and

43

hospitals where the physicians performed surgeries – were submitting claims for payment to Medicare that were false or fraudulent, and not payable, because they were tainted by kickbacks.

316.   Defendants Reliance, Kronos, Berry, Hoffman, and Pike caused the presentation of the following claims to Medicare that were false or fraudulent, and not payable:  All of the claims for payment presented to Medicare by Kronos's physician-investors and physician-employees for surgical procedures using Reliance implants, and all of the claims presented to Medicare for the related hospital services by the hospitals where Kronos's physician-investors performed those procedures.

317.   In addition to and independent of said Defendants' violations of the AKS, these Defendants also knowingly caused the above-identified physicians and the hospitals in which they performed surgeries to present claims for payment to Medicare that were not payable, and were false and fraudulent because certain of the spinal fusion surgeries performed by Kronos physician-investors and physician-employees using Reliance implants were not medically necessary or were more extensive than what was necessary.  These Defendants knew that the payments made to these physicians, through Kronos, caused the physicians and hospitals to perform and submit claims to Medicare for surgeries using Reliance implants and related hospital services that were not medically necessary and/or more extensive than what was necessary.

## COUNT III

### Against Reliance, Apex, Berry, Hoffman, and Pike

### False Claims Act:  Conspiracy (Apex)

### 31 U.S.C. § 3729(a)(3), 31 U.S.C. § 3729(a)(1)(C) (2009)

318.   The United States re-alleges and incorporates herein by reference paragraphs 1-308.

319.   Defendants Berry, Hoffman, and Pike entered into an unlawful agreement with Dr. Aria Sabit to cause the presentation of false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy.  Specifically, defendants

44

Berry, Hoffman, and Pike formed Apex as a vehicle through which they paid Dr. Sabit to induce him to use Reliance implants in his surgeries.

320. Defendants Berry, Hoffman, and Pike performed acts in furtherance of this conspiracy by, among other things, offering and paying remuneration to Dr. Sabit to induce him to use Reliance implants and falsely representing to hospitals where Dr. Sabit performed surgeries that Apex had no financial relationships with Dr. Sabit.

321. Dr. Sabit's criminal plea agreement includes sworn admissions that he formed a mutual, unlawful plan with Berry, Hoffman, and Pike, to defraud the Medicare Program, and that, along with Berry, Hoffman, and Pike, he performed acts to advance this plan, including the acts described in paragraph 110 above.

322. By virtue of the false or fraudulent claims submitted pursuant to the conspiracy, the United States suffered damages in an amount to be determined at trial.

## COUNT IV

### Against Reliance, Kronos, Berry, Hoffman, and Pike
### False Claims Act:  Conspiracy (Kronos)
### 31 U.S.C. § 3729(a)(3), 31 U.S.C. § 3729(a)(1)(C) (2009)

323. The United States re-alleges and incorporates herein by reference paragraphs 1-308.

324. The Defendants entered into an unlawful agreement to cause the presentation of false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy.  Specifically, Defendants Berry, Hoffman Pike, and Reliance formed Kronos as a vehicle through which they paid their physician-investors, including Dr. Mesiwala, remuneration in order to induce them to use Reliance implants in their surgeries.

325. Defendants Berry, Hoffman, and Pike performed acts in furtherance of this conspiracy by, among other things, offering and paying remuneration to the Kronos physician-investors to induce them to use Reliance implants and falsely representing to hospitals where Dr. Mesiwala performed surgeries that Kronos had no financial

45

relationships with any physician performing surgeries at those hospitals.

326.   By virtue of the false or fraudulent claims submitted pursuant to the conspiracy, the United States suffered damages in an amount to be determined at trial.

## COUNT V

### Against Berry, Hoffman, and Pike

### Unjust Enrichment

327.   The United States re-alleges and incorporates herein by reference paragraphs 1-308.

328.   From June 2007 to the present, Reliance, through Apex and Kronos, paid physicians remuneration to induce them to use Reliance implants in their surgeries, knowing that those implants would be included in the hospitals' bills to Medicare in violation of the AKS.  During this period, Apex and Kronos physician-investors generated approximately $13 million in illegal profit for Reliance.  Berry, Hoffman, and Pike each received and retained a share of these illegal payments.

329.   By reason of the payments described above, Bret Berry, John Hoffman, and Adam Pike received money to which they were not entitled.  Thus, these defendants have been unjustly enriched. The United States is entitled to the return of the payments from Apex and Kronos to Berry, Hoffman, and Pike.

## PRAYER FOR RELIEF

The United States requests that judgment be entered in its favor and against the Defendants as follows:

(a)   On Counts I - IV (False Claims Act), for treble the United States' damages, together with the maximum civil penalties allowed by law;

(b)   On Count V (Unjust Enrichment), in the amount by which the Defendants were unjustly enriched;

(c)   Pre- and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

1

## **<u>JURY TRIAL</u>**

2      The United States requests a trial by jury.

3

4                                         Respectfully submitted,

5

6    DATED:      August 30, 2019        JOSEPH H. HUNT
                                        Assistant Attorney General
7

8                                        /s/ David M. Finkelstein

9                                        ANDY J. MAO
                                         DAVID M. FINKELSTEIN
10                                       ARTHUR S. DI DIO
                                         ROHITH V. SRINIVAS
11                                       CLAIRE L. NORSETTER

12

13                                       Attorneys, Civil Division
                                         Department of Justice
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28