JS-6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CV 14-06979 DDP (JCx) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER RE: DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| RELIANCE MEDICAL SYSTEMS,LLC; APEX MEDICAL TECHNOLOGIES, LLC; KRONOS SPINAL TECHNOLOGIES, LLC; BRET BERRY; JOHN HOFFMAN; ADAM PIKE, | ) ) ) ) | [Dkt. 249, 269] |
| Defendants. | | |

Presently before the court are two motions for summary judgment: one filed by all Defendants, with the exception of Defendant John Hoffman (collective, the "Reliance Defendants" or "Defendants") (Dkt. 249), and the other filed by Defendants Adam Pike and Bret Barry (Dkt. 269). Having considered the submissions of the parties and heard oral argument, the court denies the Reliance Defendants' motion, grants Defendants Pike and Berry's motion, and adopts the following Order.

**I. Background**

The government's First Amended Complaint alleges that beginning in 2007, Defendants used Physician-Owned Distributorships ("PODs") to present false or fraudulent claims to Medicare. (First Amended Complaint ("FAC") ¶¶ 76, 310, 315.) As alleged in the FAC, Defendants operated a scheme through which physician-investors in, or employees of, spinal implant distribution companies, such as Defendants Apex Medical Technologies, LLC ("Apex") and Kronos Spinal Technologies, LLC ("Kronos"), were paid a portion of the distribution companies' profits from spinal implant device sales.[1] (See, e.g., FAC ¶ 96.) In short, the government alleges that spinal fusion surgeries related to this scheme were tainted by kickbacks to the doctors choosing the spinal implant products, and were, in some cases, not medically necessary. (FAC ¶¶ 3-4.) This scheme, the government alleges, violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and, by extension, the False Claims Act, 31 U.S.C. § 3729, insofar as the tainted surgeries led to false or fraudulent claims to Medicare.

The FAC also alleges that the Reliance Defendants, "[i]n addition to, and independent of said Defendants' violations of the AKS," knowingly caused two doctors, Drs. Sabit and Mesiwala, to present claims to Medicare that were false because the claims related to spinal fusion surgeries that were not medically necessary. (FAC ¶¶ 312, 317.) The FAC further alleges that, in an effort to circumvent reporting requirements applicable to PODs, the Reliance Defendants conspired to create a sham employment relationship between Kronos and Dr. Mesiwala. (FAC ¶ 141-42.) The

---

[1] The government alleges that Defendants Pike and Berry own and operate Defendants Apex, Kronos, and Reliance Medical Systems.

2

government alleges that Dr. Mesiwala submitted "grossly overstated" timesheets reflecting duplicative, unnecessary tasks. (Id. ¶ 151-163.) Payments for this work were, the government alleges, disguised profit distributions, not wages paid for actual, necessary work performed. (Id. ¶ 164-172.)

The Reliance Defendants now move for partial summary judgment on a very narrow subset of the claims alleged in the FAC. Specifically, the Reliance Defendants seek summary judgment on (1) "claims which the United States contends are false due to Reliance defendants' purported knowledge that the services were not medically necessary," "without regard to the kickback allegation" (Motion at 2:23-25; 12:1) (emphasis added); (2) claims based on allegations of unlawful remuneration paid to Dr. Mesiwala for his services as a Kronos employee, and (3) all claims based on Medicare claims made prior to September 8, 2013. Defendants Pike and Berry move separately for partial summary judgment on the government's unjust enrichment claims against Pike and Berry, individually.

**II. Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v.

3

Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the

4

evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

**III. Discussion**

A. Claims "In Addition to and Independent of" Kickbacks

At the pleading stage, this Court concluded that the existence of a kickback scheme could support the inference that the Reliance Defendants knew that physicians would perform unnecessary surgeries so as to receive kickback payments. (Dkt. 19 at 11.) Now, at the summary judgment stage, the Reliance Defendants contend that there is no evidence to support the government's allegation that, "independent of the alleged kickbacks," the Reliance Defendants knew that doctors were performing unnecessary surgeries or billing Medicare for such unnecessary procedures, and caused them to do so.

The government, perhaps led astray by the Reliance Defendants' occasional references to "the medical necessity issue," does not directly address the Reliance Defendants' argument with respect to claims untethered to kickback allegations. The government argues instead that there "are at least four reasons the Reliance Defendants foresaw or should have foreseen that their kickbacks to physicians would induce the doctors to whom they paid kickbacks to use Reliance devices based on the financial incentive, and not based on the best interest of the patient." (Opposition at 16:7-10.) As this argument illustrates, even the government's non-Anti Kickback Statute allegations are admittedly tied to the Reliance Defendants' incentive structure, or kickback scheme. In other words, as the government puts it, "Defendants' business model was to provide each of their physician partners with a monetary reward each time that physician used the defendants' products," and that

5

this model led to "surgeries that did not need to be performed (or were more extensive than what was needed)." (Opp. at 16:1-6.)

Thus, in some sense, the Reliance Defendants seek summary judgment on claims that the government has not brought. Nowhere does the First Amended Complaint allege medicare fraud "in addition to an independent of" a kickback scheme or a particular incentive structure, but rather alleges fraud in addition to "violations of the AKS." Rather, the government alleges that the Reliance Defendants knew that their incentive structure, sometimes referred to as a kickback scheme, would and did cause doctors to perform medically unnecessary procedures with Reliance devices, regardless whether that incentive structure constituted a "kickback" for purposes of the AKS. This court cannot grant the Reliance Defendants summary judgment on claims that the government did not bring.

Insofar as the Reliance Defendants seek summary judgment on the question of medical necessity, triable issues of fact remain. The government has introduced expert evidence that many surgeries were medically unnecessary, as well as evidence that the Reliance Defendants knew that affiliated surgeons were under investigation, and later suspended, by their hospitals, and knew that surgeons' use of Reliance devices increased after the surgeons gained a financial stake in the use of those devices. Although the Reliance Defendants have introduced some evidence that some of the allegedly unnecessary surgeries were medically necessary, that evidence does not warrant a grant of summary judgment. First, the Ninth Circuit has not addressed the question whether a Medicare claim can be false "when there is *only* a reasonable disagreement between medical

experts . . . , *with no other evidence* to prove the falsity of the assessment." <u>Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.</u>, 953 F.3d 1108, 1118 (9th Cir. 2020) (rejecting "objective falsehood" requirement and distinguishing <u>United States v. AseraCare, Inc.</u>, 938 F.3d 1278 (11th Cir. 2019)) (emphases original).  And, in any event, the facts here are distinguishable from <u>AseraCare</u>.  Here, triable issues remain with respect to the reasonableness of medical necessity assessments, and there is some evidence of false assessments beyond evidence of medical disagreements.  Accordingly, the Reliance Defendants' motion for summary judgment with respect to "the medical necessity issue" or claims independent of the alleged remuneration scheme is denied.

   B. Employment-Related Claims

   The Reliance Defendants also contend that any payments to Dr. Mesiwala during his employment by Kronos fall under the Anti-Kickback Statute's safe harbor provision, which states that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered goods or services" does not constitute "illegal remuneration."  42 U.S.C. 1320a-7b(b)(3)(B); <u>see also</u> 42 C.F.R. § 1001.952(I).  There appears to be no dispute that Dr. Mesiwala signed an employment agreement with Kronos, or that he submitted timesheets.  (Exs. 19, 26 ISO MSJ.)  According to Defendant Berry, in his capacity as Chief Engineer he had "an infinite need for design information and feedback" from employed physicians such as Dr. Mesiwala.  (Declaration of Bret Berry ¶ 9.)  Such feedback included the review of professional articles, which were furnished to multiple physicians.  (<u>Id.</u>)  Over a ten-month

7

period, Dr. Mesiwala evaluated 223 medical articles and submitted "numerous product design requests." (Id. ¶ 11.)  Berry found Dr. Mesiwala's input "very valuable."  (Id.)  Dr. Mesiwala was paid $372,900 over this ten-month period.  (Id. ¶ 10.)

Notwithstanding this evidence, the government points to evidence that calls into question whether Dr. Mesiwala's employment relationship with Kronos was bona fide.  For example, John Hoffman, Defendants Pike and Berry's former business partner, states that physician employees were told that their compensation would not change during the transition from a physician-ownership model to an "employment model."  (Declaration of John Hoffman ¶ 12.)  Dr. Mesiwala was also assured that he would be on the "executive team," and continue to enjoy "all the same voting rights, etc[.] as [he] previously had."  (Declaration of David Finkelstein, Ex. 20.)  Indeed, the government has presented evidence that even after transitioning to an employee role, Dr. Mesiwala continued to receive payments commensurate with the profits he had generated in his prior role as a physician-owner, and that his work hours were not determined by any "need," but rather derived from a formula that took into account the Reliance Defendants' "actual profit" to determine "The Number of Hours the Doctor Needed to Report on Coversheet for Article Evaluations." (Finkelstein Decl., Exs. 22, 23.)  Berry calculated that Dr. Mesiwala should work 85 hours per month, and Mesiwala did submit timesheets reflecting that he worked 85 hours per month for Kronos, all while continuing to work as a surgeon.  (Finkelstein Decl., Ex. 25.)  Dr. Mesiwala's "evaluation forms," in many instances, contain only a sentence or two of analysis of articles, some of which span only a page or two, and

8

arguably do not reflect the number of work-hours indicated on Dr. Mesiwala's timesheets. (Ex. 27 ISO MSJ). Indeed, Berry appears to have instructed Hoffman to tell Mesiwala to "just . . . make a quick note and sign it." (Finkelstein Decl. Ex. 29.)

In light of this evidence, the Reliance Defendants' contention that the government does no more than speculate "about the number of hours Dr. Mesiwala actually worked . . . and the value and quality of such work" is not well taken, and the argument that payments made to Dr. Mesiwala while he was employed cannot, as a matter of law, constitute an illegal kickback has no merit. Although the Reliance Defendants are free to argue that a bona fide employment relationship existed, a reasonable trier of fact could well conclude otherwise. The Reliance Defendants' motion is therefore denied with respect to employment-related claims.

    C.   Statute of Limitations

False Claims Act claims, such as those alleged here, may not be brought more than six years after the alleged violations occurred, or more than three years after "the official of the United States charged with responsibility to act" knew or should have known of "the facts material to the right of action," whichever occurs last. 31 U.S.C. 3731(b). Here, the government filed its original Complaint on September 8, 2014. The Reliance Defendants contend that the six-year statute of limitations bars all claims based upon acts prior to September 8, 2008. The government argues that it, or more specifically the Civil Division of the Department of Justice, was not aware of the pertinent facts until 2013, when the Reliance Defendants responded to government subpoenas and "educated" the government about the names and

9

locations of the Reliance PODs, the identities of physician-owners, and the relevant time periods.

The statute of limitations dispute here centers on a surreptitious recording of a July 26, 2011 meeting between a potential physician-investor and the Reliance Defendants.[2] Defendants' motion cites not to the recording itself, but rather to the government's allegations, contained in the FAC, referring to the recording. The pertinent such allegations include statements by Defendant Pike that the Reliance Defendants sought to "get around" the Anti-Kickback Statute (FAC ¶ 179), hide physicians' ownership interests in PODs from hospitals and others (FAC ¶ 197), "get familiar" with physician investors, their "volume," and their "commitment," (FAC ¶ 229), and keep Reliance judgment-proof by dispersing its assets (FAC ¶ 251).

The transcript of the recorded conversation, provided by the government in opposition to the Reliance Defendants' motion, does indeed contain statements along the lines alleged in the FAC. As the government highlights, however, the conversation includes no mention of Apex, no identification of Mesiwala's relationship other than as an "owner of something," and only general discussions of

---

[2] The Reliance Defendants also contend that a Dr. Scott Lederhouse pursued a "vendetta" against Dr. Mesiwala and spoke with the FBI about Dr. Mesiwala's financial arrangements with "Kronos/Reliance" and conflicts of interest "over a two year period." (Mot. at. 3:8-21, 4:1.) The evidence cited by the Reliance Defendants, however, does not support that contention, and states only that the Reliance Defendants' counsel reviewed reports of government interviews with Dr. Lederhaus conducted between August 2010 and November 30, 2011. (Declaration of Patric Hooper ISO MSJ ¶ 4.) There is no mention of Kronos or Reliance, let alone any indication that the FBI was made aware of material facts regarding the Reliance Defendants at any point prior to the July 26, 2011 meeting and recording.

10

1 distributions based on "profitability of the company" rather than
2 individual physicians' volume.  (Finkelstein Decl., Ex. 2.)  The
3 Reliance Defendants do not explain how the recording contains
4 "sufficient critical facts to put [the government] on notice that a
5 wrong has been committed."  U.S. ex rel. Miller v. Bill Harbert
6 Int'l Const., 505 F. Supp. 2d 1, 7 (D.D.C. 2007).[3]  Rather, the
7 Reliance Defendants appear to suggest that the recording must have
8 been sufficient to put the government on notice, because otherwise,
9 the government would not have referenced the recording in its
10 Complaint.  This logic does not hold.  Although the recording may
11 include some pertinent information, the FAC contains extensive
12 allegations that go well beyond the information contained in the
13 recording.  The court cannot agree that the information in the
14 recording, alone, was sufficient to put the government on notice of
15 the kickback scheme.[4]  The six-year filing deadline therefore does

---

[3] Although the court in Miller did conclude that some of the government's False Claims Act claims were time-barred, the facts of that case are distinguishable from those here.  Here, the recorded conversation was a part of a government investigation that ultimately resulted in the claims asserted in the FAC.  In Miller, by contrast, a whistleblower filed a detailed qui tam action detailing an alleged conspiracy to defraud the government.  Miller, 505 F. Supp. 2d at 3, 10 ("The relator's Disclosure Statement very clearly lays out that a conspiracy existed to rig bids on USAID contracts in Egypt, and detailed the manner in which the conspiracy was acted out by its participants.").

[4] In their Reply, the Reliance Defendants also suggest that the government's delay in transcribing the audio recording reflects a lack of diligence in pursuing the investigation.  (Reply at 8.) Although the apparent one-year delay in transcription does seem rather lengthy, the Reliance Defendants assert, without any support, that any delay longer than two weeks demonstrates a lack of diligence.  (Reply at 8:18.)  The court does not agree.  The court notes that the Reliance Defendants' two-week framework appears to be derived not from anything inherent to the transcription process, but rather from an effort to suggest that any transcription, referral, and subsequent investigation should
(continued...)

11

not bar the government's claims predicated on submissions to Medicare prior to September 8, 2008.

D. Unjust Enrichment

Defendants Pike and Berry's separate motion contends that the government's unjust enrichment claim against them fails because there is no evidence that either Pike or Berry every received any payment traceable to a fraudulent Medicare payment, let alone any evidence as to the total amount traceable to Medicare and received by either Pike or Berry. (Second MSJ at 1.) As an initial matter, the parties dispute whether state or federal common law applies to the government's unjust enrichment claim.[5] It is well-established that "federal law governs questions involving the rights of the United States arising under nationwide federal programs," such as Medicare. United States v. Kimbell Foods, Inc., 440 U.S. 715, 726 (1979). Nevertheless, Berry and Pike are correct that some courts, even after Kimbell, appear to apply state court unjust enrichment principles, even in cases related to Medicare fraud. See, e.g., United States v. Teva Pharms. USA, Inc., No. CV 20-11548-NMG, 2021 WL 4132592, at *8 (D. Mass. Sept. 9, 2021). Although this Court looks to federal common law, in accordance with Kimbell, the court agrees with Pike and Berry that any distinctions between federal and state common law are meaningless here, where the controlling

---

[4](...continued) have been completed within a month of the recorded conversation, thus requiring the government to file "by August 2014," rather than the actual filing date of September 8, 2014.

[5] Pike and Berry do not explain which state's common law principles should apply, citing to cases applying the common law of three different states.

12

principle at issue, whether a plaintiff actually conferred a benefit on the defendant, is the same under either formulation.

The government argues that it "has identified approximately $29 million in disbursements made from Reliance PODs to Berry and Pike between 2007 and 2012," that Pike and Berry received over $6.7 million from Apex and Kronos, and that "[b]y comparing Apex order forms with Medicare enrollment information, the United States has identified $628,117 in payments to Reliance Defendants based on Dr. Sabit's surgeries on Medicare patients in 2010 alone." (Opp. to MSJ 2 at 2:21-3:4.)

First, the court notes that the government does not assert that any of these amounts is the amount by which Pike and Berry were unjustly enriched. Indeed, for that to be true, the amounts identified, whether the $29 million in disbursements from Reliance PODs, including all $6.7 million from Apex and Kronos and all $628,117 from Apex in 2010, would have to stem not only from Medicare, but from a false or fraudulent claim, and would also have to have flowed entirely to Pike or Berry. Furthermore, the evidence cited does not support the government's factual assertions. The government cites to the Declaration of David Finkelstein, for example, to support its assertion that Pike and Berry received $29 million in disbursements from Reliance PODs. Although the Finkelstein Declaration does assert that the declarant, the government's counsel, "reviewed records" indicating that Pike and Berry received such amounts, no specific records are attached or identified, let alone authenticated. Although the government does identify specific exhibits in support of the $6.7 million figure, those exhibits do not, contrary to the government's

13

characterization, identify any payments to Pike or Berry.[6] (Finkelstein Decl., Exs. 6, 7.)  Moreover, the evidence of $628,117 in Medicare payments to "Reliance Defendants," and not to Pike or Berry individually, consists of bills from Apex to a hospital, not payment or distribution records.  Even assuming each of those bills pertains to a Medicare patient, there is no indication whether those bills were paid, when they were paid, what proportion of payments were made with Medicare funds, whether any or all such Medicare payments were fraudulent, or whether any or all such payments flowed to Pike or Berry.  (Finkelstein Decl., Ex. 8.)  As the government has now conceded, it did not submit any exhibits demonstrating that any funds distributed to Pike Industries, Inc. or Berry Medical Enterprises, Inc. ever flowed to Defendant Pike or Defendant Berry.

Absent any evidence that illegal Medicare payments flowed to Berry or Pike individually, summary judgment on the unjust enrichment claims must be granted in those defendants' favor.[7]

**IV. Conclusion**

---

[6] The Apex record identified by the government appears to identify only payments to Dr. Sabit.  The Kronos record reflects payments to Pike Industries, Inc. and Berry Medical Enterprises, Inc., but not to Pike or Berry individually.

[7] To the extent Pike and Berry contend that illegal Medicare payments must have been made to them directly, that argument has no merit.  See United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970) (finding farmers liable where they paid lower amounts to a contractor who then sought and received inflated reimbursement payments from the Department of Agriculture, with the farmers' knowledge); see also United States v. Bellecci, No. CIVS051538LKKGGHPS, 2008 WL 802367, at *5 (E.D. Cal. Mar. 26, 2008); United States v. Khan, No. 03-CV-74300, 2009 WL 2461031, at *5 n.4 (E.D. Mich. Aug. 5, 2009); United States v. Health Care Mgmt. Partners, Ltd, No. 04-CV-2340-REB-BNB, 2005 WL 8171865, at *7 (D. Colo. Oct. 31, 2005).

14

For the reasons stated above, the Reliance Defendants' motion for summary judgment (Dkt. 249) is DENIED.  Defendants Pike and Berry's motion for summary judgment (Dkt. 269) as to the unjust enrichment claim alleged in Count Five of the FAC is GRANTED.

IT IS SO ORDERED.

Dated: November  10, 2021

DEAN D. PREGERSON
United States District Judge