O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CV 14-06979 DDP (JCx) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER RE: GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| RELIANCE MEDICAL SYSTEMS,LLC; APEX MEDICAL TECHNOLOGIES, LLC; KRONOS SPINAL TECHNOLOGIES, LLC; BRET BERRY; JOHN HOFFMAN; ADAM PIKE, | ) ) ) ) ) | [Dkt. 283] |
| Defendants. | | |

Presently before the court is Plaintiff United States of America ("the government")'s Motion for Partial Summary Judgment. Having considered the government's submissions and those of all Defendants, with the exception of Defendant John Hoffman (collectively, the "Reliance Defendants" or "Defendants"), and having heard oral argument, the court grants the motion in substantial part and adopts the following Order.

**I.  Background**

The government's First Amended Complaint alleges that beginning in 2007, Defendants used Physician-Owned Distributorships

("PODs")to present false or fraudulent claims to Medicare. (First Amended Complaint ("FAC") ¶¶ 76, 310, 315.) As alleged in the FAC, Defendants operated a scheme through which physician-investors in, or employees of, spinal implant distribution companies, including Defendants Apex Medical Technologies, LLC ("Apex") and Kronos Spinal Technologies, LLC ("Kronos"), were paid a portion of the distribution companies' profits from spinal implant device sales.[1] (See, e.g., FAC ¶ 96.) In short, the government alleges that spinal fusion surgeries related to this scheme were tainted by kickbacks to the doctors choosing the spinal implant products, and were, in some cases, not medically necessary. (FAC ¶¶ 3-4.) This scheme, the government alleges, violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and, by extension, the False Claims Act, 31 U.S.C. § 3729, insofar as the tainted surgeries led to false or fraudulent claims to Medicare. Doctor-participants in this scheme allegedly included Dr. Ali Mesiwala, Dr. Gowariharian Thaiyananthan, Dr. Aria Sabit, and Dr. Sean Xie. (FAC ¶¶ 91n 118, 129).

The government now seeks partial summary judgment that Apex and Kronos physician-investors performed 268 surgeries on Medicare patients between August 1, 2007 and December 31, 2013, after obtaining a financial interest in Apex or Kronos. The government further seeks summary judgment establishing that these 268 surgeries resulted in 838 claims for payment to the Medicare program, resulting in $9,250,611 in Medicare payments. The

---

[1] The government alleges that Defendants Pike and Berry own and operate Defendants Apex, Kronos, and Reliance Medical Systems.

2

government does not, however, seek a determination that any of those payments were false or fraudulent.

"[T]he essential elements of False Claims Act liability are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d 890, 902 (9th Cir. 2017). "[A] claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C.A. § 1320a-7b. The government now also seeks partial summary judgment that, as a matter of law, the alleged violations of the AKS are material for purposes of the False Claims Act.

## II. Legal Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is

3

an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

**III. Discussion**

A. Number of Medicare surgeries, claims, and payments

4

The government asserts that there is no material dispute that "between August 1, 2007, and December 31, 2013, the Apex and Kronos physician-investors performed 268 surgeries resulting in 838 claims for payment to the United States for which the Medicare program paid a total of $9,250,611." The government's figures are supported by the declaration of government expert Ian M. Dew, who arrived at his conclusions after cross-referencing Medicare records against hospital implant logs.[2] (Declaration of Ian M. Dew. ¶¶ 8, 10.) Notably, Dew described his conclusions as pertaining to "the four physicians that the United States <u>alleges to have been physician-investors</u>" in Apex and Kronos. (Dew. Decl. ¶ 3 (emphasis added).)

Although the Reliance Defendants challenge the accuracy of Dew's calculations, they present no specific criticism of his methodology, nor any evidence contradicting or casting doubt upon his conclusions. Rather, the Reliance Defendants contend that Dew did not "accurately portray the number of claims pertaining to surgeries performed by 'physician-investors' in Kronos" because Dew included surgeries performed by Dr. Mesiwala during a time period in 2013 when Dr. Mesiwala was, at least ostensibly, an employee of Kronos, as well as surgeries performed during other time periods.[3] (Opposition at 4:14-16.) As noted above, however, Dew took no

---

[2] There is no dispute that the report upon which Dew's declaration is based, which the government refers to as a Supplemental Report, was timely produced prior to the close of expert discovery.

[3] Portions of the Reliance Defendants' Opposition is devoted to disputing the government's characterization of aspects of this case that are not at issue in the present motion, such as the formation and existence of PODs and the ownership and compensations structures of various business entities.

5

position on whether any doctor was a physician-investor. Rather, he analyzed surgeries performed by doctors "that the United States alleges to have been physician-investors." Thus, to the extent the government seeks to rely upon the Dew Declaration for the contention that any surgeries were performed by any "physician-investor," summary judgment is not warranted. By the same token, however, any dispute about Dr. Mesiwala's status has no bearing on Dew's conclusions regarding the number of surgeries Dr. Mesiwala performed or the number or amount of Medicare claims related thereto.

There is no material dispute that between August 1, 2007, and December 31, 2013, Drs. Mesiwala, Thaiyananthan, Sabit, and Xie performed 268 surgeries resulting in 838 claims for payment to the United States, for which the Medicare program paid a total of $9,250,611.

B. Materiality

Courts construe the False Claims Act broadly, "as it is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." Campie, 862 F.3d at 899 (internal quotation marks and citation omitted). "[T]he essential elements of False Claims Act liability are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." Id. at 902. Fraudulent claims may include those that "falsely certif[y] compliance with a statute or regulation as a condition to government payment." U.S. ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1171 (9th Cir. 2006).

6

The Anti-Kickback Statute, a criminal provision, "targets any remunerative scheme through which a person is paid 'in return for' referrals to a program under which payments may be made from federal funds." Guilfoile v. Shields, 913 F.3d 178, 189 (1st Cir. 2019) (internal quotation marks and citation omitted). Courts have long held that compliance with the AKS is a precondition to the payment of Medicare claims. See U.S. ex rel. Kester v. Novartis Pharms. Corp., 41 F. Supp. 3d 323, 330 (S.D.N.Y. 2014) (collecting cases). In 2010, however, the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 1110148, 124 Stat. 119 (2010), explicitly linked the AKS to the FCA by providing that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

Although false and fraudulent conduct and materiality are separate elements of a FCA violation, several courts have concluded that compliance with the AKS is material to the government's decision to pay Medicare claims. See, e.g., United States ex rel. Gohil v. Sanofi U.S. Servs. Inc., No. CV 02-2964, 2020 WL 4260797, at *14 n.22 (E.D. Pa. July 24, 2020) (collecting cases); see also United States ex rel. Wood v. Allergan, Inc., 246 F. Supp. 3d 772, 818 (S.D.N.Y. 2017) (reversed on other grounds, 899 F.3d 163 (2d Cir. 2018)); United States v. Berkeley Heartlab, Inc., No. CV 9:14-230-RMG, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017) ("AKS compliance is *per se* material to payment decisions.").[4] As the

---

[4] Contrary to the Reliance Defendants' characterization, the Ghofil court did not conclude that AKS violations are not per se material. Ghofil, 2020 WL 4260797 at *14 ("Whether or not AKS
(continued...)

7

First Circuit explained, the 2010 PPACA amendment "obviat[ed] the need for a plaintiff to plead materiality . . . . This construction inescapably follows from the statute's plain language stating that a claim resulting from a violation of the AKS 'constitutes a false or fraudulent claim.' The statute's use of the term 'constitutes' would be meaningless if courts had to engage in a materiality analysis . . . after establishing that a claim resulted from an AKS violation."[5] Guilfoile v. Shields, 913 F.3d 178, 190 (1st Cir. 2019) (internal citation omitted).

In the instant case, the government alleges fraudulent Medicare claims both preceding and postdating the March 23, 2010 effective date of the PPACA amendment linking the AKS to the False Claims Act. The Reliance Defendants argue that "an alleged violation of the AKS may only be presumed to be material on summary judgment when post March 23, 2010 claims are at issue." (Opposition at 7:22-23.) At least one court has agreed with this

---

[4] (...continued) violations are per se material, however, summary judgment would remain inappropriate."). Indeed, the court recognized that "[t]he vast majority of courts to address this question after Escobar have agreed with Relator that AKS violations are per se material." Id. (discussing Universal Health Servs., Inc. v. United States ex rel. Escobar ("Escobar"), 579 U.S. 176 (2016).

[5] At least one court has suggested that a materiality analysis is required, even in the context of an AKS violation. See United States ex rel. Simpson v. Bayer Corp., 376 F. Supp. 3d 392, 415 (D.N.J. 2019). The Simpson court, however, denied a motion for summary judgment in part because discovery had not yet closed and, the court theorized, the defendant might be able to present evidence that the government regularly paid fraudulent claims, notwithstanding actual knowledge that the claims were false. Id. Here, discovery is closed, and the Reliance Defendants have not produced any such evidence or suggested that such evidence exists.

8

position. See United States v. Teva Pharms. USA, Inc., No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *28 (S.D.N.Y. Feb. 27, 2019).

Other courts, however, have concluded that "AKS compliance was *per se* material even before the PPACA." Berkeley Heartlab, 2017 WL 6015574 at *2; see also Wood, 246 F. Supp. 3d at 812, 818 (Having "no trouble concluding that compliance with the AKS is a 'material' condition of payment," even while "[p]utting aside the question of whether [PPACA] has a bearing on interpretation of the interplay between the AKS and the FCA before March 23, 2010."). As the Berkeley Heartlab court observed, courts have long held, even prior to PPACA, that compliance with the AKS is a condition of payment under Medicare. See, e.g., McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1260 (11th Cir. 2005); U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., 565 F. Supp. 2d 153, 159 (D.D.C. 2008) ("Legion other cases have held violations of AKS . . . can be pursued under the FCA, since they would influence the Government's decision of whether to reimburse Medicare claims."); U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F. Supp. 2d 1017, 1047 (S.D. Tex. 1998). In the First Circuit's words, "[t]he legislative history suggests that the 2010 amendment was intended to codify the link between AKS violations and false claims within the meaning of the FCA as well as to correct one district court case holding that claims for payment resulting from AKS violations could be laundered if the claims were submitted to the government by a party who was unaware that a kickback had occurred." Guilfoile, 913 F.3d at 191 n. 12 (citing 155 Cong. Rec. S10852-01, S10853-54 (daily ed. Oct. 28, 2009) (internal quotation

marks omitted)).  That is to say, PPACA clarified, but did not change, existing law.  <u>Kester</u>, 41 F. Supp. 3d at 332-335.

The court agrees with the majority view that compliance with the Anti-Kickback Statute is necessarily material to the government's decision to pay Medicare claims, even prior to March 23, 2010.  Accordingly, the government's motion for partial summary judgment is granted with respect to materiality.

**IV.  Conclusion**

For the reasons stated above, the government's Motion for Partial Summary Judgment is GRANTED, in substantial part.  The motion is granted with respect to the number of surgeries performed by Drs. Mesiwala, Thaiyananthan, Sabit, and Xie and the number and dollar amount of Medicare claims related thereto.  Whether any or all of those doctors was a "physician-investor," however, presents a triable issue.  The motion is also granted with respect to materiality, as violations of the Anti-Kickback Statute are material for purposes of the False Claims Act as a matter of law.

IT IS SO ORDERED.

Dated: February 22, 2022

DEAN D. PREGERSON
United States District Judge

10